**BROOKS SHOE MANUFACTURING CO., INC., a Pennsylvania Corporation, Plaintiff-Appellant,**

v.

**SUAVE SHOE CORPORATION, a Florida Corporation, Defendant-Appellee.**

No. 82–5003.

United States Court of Appeals, Eleventh Circuit.

Oct. 7, 1983.

Richard M. Leslie, Shutts & Bowen, Miami, Fla., Alan H. Bernstein, Caesar, Rivise, Bernstein & Cohen, Philadelphia, Pa., for plaintiff-appellant.

Greenberg, Traurig, Askew, Hoffman, Lipoff, Quentel & Wolff, Marlene K. Silverman, Barry D. Hunter, Miami, Fla., Allan M. Lowe, Arlington, Va., for defendant-appellee.

Before GODBOLD, Chief Judge, ANDERSON, Circuit Judge, and GOLDBERG *, Senior Circuit Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant, Brooks Shoe Manufacturing Co., Inc. ("Brooks") brought this action for trade dress infringement against Suave Shoe Corporation ("Suave"). After a non-jury trial, the District Court for the Southern District of Florida entered judgment in favor of Suave. We affirm.

## I. FACTS[1]

Brooks is a Pennsylvania corporation which has been selling athletic shoes and related products since 1914.[2] Most of the shoes Brooks sells are "high performance" shoes, made of lightweight, durable, high-quality materials and designed to meet the needs of serious athletes. The majority of Brooks' sales are to stores which sell a full line of sporting goods or stores which specialize in selling athletic shoes. In 1978, Brooks shoes generally sold at retail prices in excess of $25 per pair.

In 1973, Brooks began selling shoes with a "V" design on the sides. By 1977, this "V" design appeared on almost every shoe in the Brooks line. In the late 1970's, Brooks engaged in substantial promotional activities, advertising its shoes in magazines such as "Runner's World" and "Running Times," sponsoring races and other athletic events, and paying various professional athletes to wear Brooks shoes. During this same period of time, the sales of Brooks shoes increased rapidly.[3]

Suave, a Florida corporation, is primarily engaged in manufacturing and selling casual, athletic, work, dress and leisure shoes. Traditionally, Suave has been a major manufacturer of canvas shoes. In response to changing consumer preferences in the mid-1970's, however, Suave began manufacturing athletic and leisure shoes with vinyl, man-made suede and nylon uppers. Suave sells most of its shoes to mass merchandisers, variety stores, drug stores, and discount stores. Generally, Suave shoes are unbranded or carry the retailer's brand name. Suave shoes are made of inexpensive materials, and in 1978 Suave shoes generally sold at retail prices ranging from $8 to $12.

In January of 1979, Suave began manufacturing and selling a line of athletic and leisure shoes which had a "V" design on the sides.[4] Brooks, through its attorney, promptly notified Suave that it believed that the use of the "V" design infringed on Brooks' trademark and trade dress rights. When Suave did not immediately discontinue production of shoes with the "V" design,[5] Brooks brought an action in the district court alleging violations of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Florida Deceptive and Unfair Trade Practices Act, the Florida Anti-Dilution Statute, and the common law of unfair competition. The district court refused to grant a prelim-

---

* Honorable Irving L. Goldberg, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. We briefly summarize the facts as found by the district court. See Brooks Shoe Manufacturing Co. v. Suave Shoe Corp., 535 F.Supp. 75 (S.D.Fla.1981).

2. Despite its name, Brooks does not actually manufacture the shoes that it sells.

3. For example, sales of Brooks training shoes increased from slightly over 400,000 in fiscal 1976 to more than 2,500,000 in fiscal 1978. Brooks attributed this rise in sales to its promotional efforts, but the district court noted that the increased interest in running as a form of exercise during the late 1970's may have contributed significantly to the rise in sales.

4. Suave's counsel has consistently argued that Suave's shoes have a "7" design rather than a "V" design. We do not attach any importance to this alleged distinction between the designs.

5. Although Suave did not discontinue production of shoes with the "V" design immediately, the district court found that Suave voluntarily stopped producing such shoes shortly after receiving a letter from Brooks' attorney. 533 F.Supp. at 77 n. 2. The record supports this finding and also indicates that all, or virtually all, of the shoes with the "V" design which Suave produced after being contacted by Brooks already had been on order before Brooks notified Suave of the alleged infringement.

inary injunction and, after a six-day non-jury trial, entered judgment for Suave on all counts. On appeal, Brooks contends that the district court erred in entering judgment for Suave on the Lanham Act claim.[6]

## II. DISCUSSION

■ In order to prevail on a trade dress infringement claim under § 43(a) of the Lanham Act, a plaintiff must prove that its trade dress has acquired secondary meaning,[7] that features of its trade dress are primarily nonfunctional, and that the defendant's product has trade dress which is confusingly similar to its own trade dress. See John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966 (11th Cir.1983). In this case, the district court found that Brooks had failed to prove that the "V" design on its shoes had acquired secondary meaning as of January 1979, when Suave began selling shoes with a similar trade dress.[8] Brooks attacks this finding on three grounds, each of which is considered below.

Brooks' first contention is that it did not have to prove secondary meaning because its "V" design is inherently distinctive. Brooks points out that the former Fifth Circuit's decision in Chevron Chemical Co. v. Voluntary Purchasing Groups, 659 F.2d 695 (5th Cir., 1981) (Unit A),[9] indicated that a plaintiff in a trade dress infringement action need not prove secondary meaning when the product's trade dress is inherently

distinctive. Cf. John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d at 981 n. 25 (suggesting in dicta that the approach taken in Chevron Chemical "has merit"). Thus, Brooks argues, the district court erred when it required Brooks to prove that its design had acquired secondary meaning.

■ The difficulty with Brooks' argument is that the district court assumed that a plaintiff need not prove secondary meaning when its trade dress is inherently distinctive, but found, as a matter of fact, that "there is nothing arbitrary or fanciful about the Brooks' 'V' that would make it inherently distinctive." 533 F.Supp. at 77. The district court's factual finding cannot be set aside unless clearly erroneous. Fed.R.Civ.P. 52(a); Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 855, 102 S.Ct. 2182, 2188–2189, 72 L.Ed.2d 606 (1982) (noting, in a trademark case, that an appellate court must accept the trial court's findings of fact unless it has a " 'definite and firm conviction that a mistake has been committed' ") (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Our review of the record indicates that the district court's finding was not clearly erroneous.

In Seabrook Foods, Inc. v. Bar-Well Foods, Ltd., 568 F.2d 1342 (Cust. & Pat. App.1977), the Court of Customs and Patent Appeals outlined several factors which

---

6. Brooks has not appealed the adverse judgment on the Florida law and common law claims.

7. To establish secondary meaning the plaintiff must show that the primary significance of the product in the minds of the consuming public is not the product itself but the producer. See Vision Center v. Opticks, Inc., 596 F.2d 111, 118 (5th Cir.1979) cert. denied, 444 U.S. 1016, 100 S.Ct. 668, 62 L.Ed.2d 646 (1980).

8. The district court also found that there was no likelihood of confusion between the trade dress of Suave's shoes and the trade dress of Brooks' shoes. We need not review this finding because we conclude below that there is no error in the district court's ruling on the secondary meaning issue.

9. As noted in Original Appalachian Art Works, Inc. v. Toy Loft, Inc., 684 F.2d 821, 831 n. 14 (11th Cir.1982), Chevron Chemical is not binding authority in this circuit because it was decided by a Unit A panel of the former Fifth Circuit after October 1, 1981. See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981); Stein v. Reynolds Securities, Inc., 667 F.2d 33, 34 (11th Cir.1982) (adopting as binding precedent all of the post-September 30, 1981 decisions of Unit B of the former Fifth Circuit). Nevertheless, Chevron Chemical is persuasive authority because it relies directly on former Fifth Circuit cases which are binding precedent.

should be considered when determining whether a particular design is inherently distinctive. Among the factors are "whether it [is] a 'common' basic shape or design, whether it [is] unique or unusual in a particular field, [and] whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods . . . ." *Id.* at 1344 (footnotes omitted).

In this case, each of these factors indicates that Brooks' trade dress is not inherently distinctive. As the district court noted, the design on the sides of Brooks shoes "could be characterized as a 'V' on its side, an arrow, or a '7'." 533 F.Supp. at 77. Such a basic geometric shape generally is not considered inherently distinctive. *See* 1 J.T. McCarthy, Trademarks and Unfair Competition, § 7:12, at 172 (1973) ("ordinary geometric shapes . . . are regarded as non-distinctive and protectable only upon proof of secondary meaning"). Moreover, Brooks' trade dress is not unique or unusual in the field of athletic shoes, but is merely a "refinement of a commonly-adopted and well-known form of ornamentation . . . for the goods." *Seabrook Foods,* 568 F.2d at 1344.[10] In fact, in an amendment to its application to register the "V" design on its shoes with the patent and trademark office, Brooks itself noted that "the buying public is constantly exposed to a dizzifying number of 'V's', 'flashes' and 'swooshes' in the course of purchasing running shoes." Defendant's Exhibit 92 (amendment to Brooks' application to register trademark, October 20, 1978).

Further, although Brooks relies heavily on the former Fifth Circuit's decision in *Chevron Chemical, supra,* to support its contention that the "V" design is inherently distinctive, examination of the facts of that case indicates that Brooks' reliance is misplaced. The trade dress which the court found was inherently distinctive in *Chevron Chemical* involved "the combination of particular hues of colors, arranged in certain geometric designs, presented in conjunction with a particular style of printing, in such fashion that, taken together, they create a distinctive visual impression." 659 F.2d at 703. The "V" design on the sides of Brooks shoes is much more similar to the three-stripe design on the sides of Adidas athletic shoes, which the Trademark Trials and Appeals Board found could be registered as a trademark only after the manufacturer offered proof of secondary meaning. *See In re Dassler,* 134 U.S.P.Q. 265, 266 (T.T.A.B. 1962) ("In view of applicant's extensive promotion of its '3 stripe' mark over the years together with the trade recognition of this design as indicating origin in applicant . . . applicant has made a sufficient prima facie showing that the design in issue does identify its goods"); *cf.* 1 J.T. McCarthy, *supra,* § 7:7, at 164–66 (discussing the Adidas case and other cases in which applicants argued that their designs were inherently distinctive). Accordingly, we hold that the district court did not err when it ruled that Brooks had to prove secondary meaning because the "V" design on its athletic shoes is not inherently distinctive.

Brooks' second contention on appeal is that it did not have to prove secondary meaning because the district court found that Suave "intentionally copied the 'V' design and the color schemes used by Brooks

**10.** Recent opinions by the Trademark Trials and Appeals Board have noted that there are numerous athletic shoes in the marketplace which contain decorative stripes, bars and designs. *See In re Lucky Co.,* 209 U.S.P.Q. 422, 423 (T.T.A.B.1980) (stating that "it is the common practice among the manufacturers of athletic shoes to place various [s]tripe and bar designs on the sides of their respective shoes" and noting that this practice leaves such manufacturers "with marks that are extremely weak and certainly entitled to only a very narrow and

limited scope of protection"); *Puma-Sportschuhfabriken Rudolf Dassler KG v. Roller Derby Skate Co.,* 206 U.S.P.Q. 255, 258 (T.T.A.B. 1980) (stating that "numerous manufacturers of athletic or sport shoes apply strips, stripes or some type of band design to the side panels of their shoes, which actually serve as decorative or ornamental elements," and expressing "serious doubts" about "the capacity of such strip or stripe designs to function also as trademarks to distinguish the shoes of one manufacturer from those of another").

and other shoe manufacturers." 533 F.Supp. at 75. According to Brooks, once the district court made this finding of intentional copying, the court should have presumed secondary meaning as a matter of law.

We recognize that some courts have indicated that proof of certain egregious conduct by a defendant, such as palming off,[11] is sufficient to establish secondary meaning. *See* 1 J.T. McCarthy, *supra*, §§ 15:4–5 (discussing cases which have allowed substitutes for secondary meaning). In most cases, however, the court indicated that the plaintiff had to prove more than just intentional copying in order to be relieved of the burden of proving secondary meaning. For example, in *Polo Fashions, Inc. v. Extra Special Products, Inc.*, 451 F.Supp. 555 (S.D. N.Y.1978), the court stated that the plaintiff need not establish secondary meaning "if instances of *actual palming off* and *deception* are involved." 451 F.Supp. at 563 (emphasis added). *See also, e.g., Norwich Pharmacal Co. v. Sterling Drug, Inc.*, 271 F.2d 569, 571–72 (2d Cir.1959) (noting that although secondary meaning is not always required, plaintiff "must fit its case into one of the remaining categories" such as passing off or diverting plaintiff's customers "by means of deception"); *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 135 (S.D.N.Y.1972) (indicating

that both New York and federal law allow injunctions to issue without proof of secondary meaning when "the defendant has engaged in various predatory practices such as abuse of confidential business secrets ..., breach of fiduciary duty ..., or palming off its product as that of plaintiff ...."). *But see, e.g., Harlequin Enterprises v. Gulf & Western Corp.*, 644 F.2d 946, 950 (2d Cir.1981) (stating that "New York law shields trade dress from intentional copying even if it has not acquired secondary meaning"); *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir.1960) (indicating that proof of exact copying, without any opposing proof, is sufficient to establish secondary meaning).

In this case, although the district court found that Suave had intentionally copied Brooks' design, the court also found that Suave had not engaged in palming off or actual deception. 533 F.Supp. at 81–82. Thus, the only question before us is whether proof of intentional copying, by itself, is an adequate substitute for proof of secondary meaning.[12]

█ Brooks has not cited any cases from this circuit or from the former Fifth Circuit which hold that proof of intentional copying alone eliminates the need for proof of secondary meaning,[13] and we decline to

11. "Palming off is an attempt by one person to induce consumers to believe that his product is actually that of another; it requires an intent to deceive and proof of actual fraud." *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 135 (S.D.N.Y.1972).

12. We expressly do not decide whether proof of some other type of conduct by a defendant might be an adequate substitute for proof of secondary meaning.

13. In its brief, Brooks relies heavily on a former Fifth Circuit case which dealt primarily with the analogous likelihood of confusion issue and stated that "if ... a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'" *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 506 (5th Cir.1980) (quoting RESTATEMENT OF TORTS, § 729,

Comment f (1938)). Brooks argues that this quotation indicates that intentional copying alone proves likelihood of confusion. We disagree. As noted in the text, there is a difference between "intentional copying" and adopting a mark or design "with the intent of deriving benefit from" another person's mark. Further, the *Exxon* court did not hold that proof of intentional copying conclusively establishes likelihood of confusion, but that such proof merely *justifies an inference* of likelihood of confusion. In fact, just before the statement quoted above, the *Exxon* court indicated that "[a] defendant's intent to deceive buyers is merely one factor to be considered in determining whether there is a likelihood of confusion." *Id.* Thus, we believe that *Exxon* actually indicates that proof of intentional copying is evidence, but not conclusive, on the likelihood of confusion issue, which is consistent with our holding in the text regarding the effect of proof of intentional copying on the secondary meaning issue.

adopt such a rule in this case. Although we believe that proof of intentional copying is probative evidence on the secondary meaning issue, we cannot agree with Brooks that proof of intentional copying conclusively establishes that the plaintiff's trademark or trade dress has acquired secondary meaning. As Professor McCarthy has noted, close copying does not *necessarily* indicate that the defendant has attempted to capitalize on the secondary meaning of plaintiff's trademark or trade dress because "[t]here may have been many other motivations for defendant's actions." 1 J.T. McCarthy, *supra,* § 15:4, at 531. Further, "[i]t must . . . not be forgotten that there is absolutely nothing legally or morally reprehensible about exact copying of things in the public domain." *Id. Cf. B.H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1259 (5th Cir.1971) (noting that "outright copying is often a civilizing rather than a cannibalizing folkway"). Accordingly, we reject Brooks' contention that the district court should have presumed secondary meaning as a matter of law simply because the court found that Suave had intentionally copied the designs and color schemes used by Brooks and other shoe manufacturers.

■ Brooks' final contention on appeal is that the district court erred when it found that Brooks had not established that its "V" design had acquired secondary meaning as of January 1979. Whether a particular trademark or trade dress has acquired secondary meaning is a question of fact, *Volkswagenwerk Aktiengesellschaft v. Rickard,* 492 F.2d 474, 477–78 (5th Cir.1974), and thus our review of this issue, like our review of the question of the inherent distinctiveness of Brooks' design, *supra,* is limited by the clearly erroneous standard.

■ In an effort to prove that the "V" design had acquired secondary meaning as of January 1979, Brooks presented evidence of a substantial increase in sales during the late 1970's which Brooks attributed to its promotional efforts. We recognize that evidence of sales, advertising and promotional activities may be relevant to determining whether a trademark or trade dress has acquired secondary meaning, *see* 1 J.T. McCarthy, *supra,* §§ 15:16–19, but we are unable to conclude that Brooks' evidence was sufficient to prove secondary meaning in this case. As the district court pointed out, the growth in Brooks' sales during the late 1970's may have been attributable in large part to the increased interest in running and jogging during the same period.[14] More importantly, the district court found that much of Brooks' advertising featured the "mechanical and design aspects of [Brooks'] shoes," 533 F.Supp. at 78, and that Brooks did not engage in substantial "image advertising," featuring the "V" design and other aesthetic aspects of the shoes, until after January of 1979. Under such circumstances, even evidence of extensive advertising and other promotional efforts does not necessarily indicate that prospective buyers of athletic shoes would associate the "V" design on Brooks shoes with a particular source. *Cf. Aloe Creme Laboratories, Inc. v. Milsan, Inc.,* 423 F.2d 845, 850 (5th Cir.1970) (stating that "the question is not the *extent* of the promotional efforts, but their *effectiveness* . . . .") (emphasis in original), *cert. denied,* 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970).

■ Brooks also relied on a consumer survey to prove that the "V" design had acquired secondary meaning. The district court admitted the survey into evidence, but did not give it much weight because the survey contained numerous "procedural and methodological errors" and, even more important, was not based on a proper survey universe. 533 F.Supp. at 79–80. We agree with the district court's conclusion that the "procedural and methodological errors committed in conducting the survey cast doubt

---

14. John E. Overlock, a consultant and the former chairman of the Athletic Shoe Committee of the Sporting Goods Manufacturers Association, testified at trial that overall sales of running shoes almost tripled between 1976 and 1979.

on the survey's accuracy.[15] We also agree with the finding that Brooks' survey universe—spectators and participants at several organized track meets in the Washington-Baltimore area—was too narrow to be of significant probative value in determining whether Brooks' "V" design had acquired secondary meaning among prospective purchasers of athletic-type shoes. *See Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 264 (5th Cir.1980) ("The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services."), *cert. denied,* 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); *cf. American Basketball Association v. AMF Voit, Inc.,* 358 F.Supp. 981, 986 (S.D.N.Y.) (dis-

counting survey which allegedly demonstrated that red, white and blue basketballs had acquired secondary meaning, in part because plaintiff's survey universe, males between 12 and 23 years old who had played basketball within the past year, was too narrow to establish whether plaintiff's design had acquired secondary meaning among prospective purchasers of basketballs), *aff'd,* 487 F.2d 1393 (2d Cir.1973), *cert. denied,* 416 U.S. 986, 94 S.Ct. 2389, 40 L.Ed.2d 763 (1974). Thus, like the district court, we conclude that Brooks' survey was of only limited value in determining whether Brooks' "V" design had acquired secondary meaning as of January 1979.[16]

Brooks has not cited any other significant factors on the secondary meaning issue.[17]

**15.** The district court opinion fully discusses the problems with the survey, 533 F.Supp. at 79–80, and we see no reason to repeat that discussion here.

**16.** In addition to discounting the value of Brooks' survey, the district court gave considerable weight to survey evidence introduced by Suave. *See* 533 F.Supp. at 80–82. On appeal, Brooks attacks the district court's use of Suave's survey on two grounds.

First, Brooks argues that Suave's survey had numerous procedural and methodological errors. Our review of the record indicates that while Suave's survey had deficiencies, the district court did not err when it concluded that the survey "substantially complie[d]" with the factors listed for evaluating consumer surveys in the Handbook of Recommended Procedures for the Trial of Protracted Cases which was issued by the Judicial Conference of the United States in 1960. *See* 25 F.R.D. 351 (1960). In particular, we note that Suave's survey universe, households in Baltimore, Maryland, and Greensboro, North Carolina, in which one or more individuals had purchased one or more pairs of athletic-type shoes during the previous 12 months, was much more appropriate than the universe selected for Brooks' survey. *See Amstar Corp. v. Domino's Pizza, Inc., supra.*

Second, Brooks contends that the district court should have excluded the testimony of Suave's survey expert due to an alleged conflict of interest. The record reveals that Brooks contacted the expert in January of 1980 regarding the possibility of conducting a survey for Brooks. After an exchange of letters, Brooks' representatives had one meeting with the expert, but decided not to hire him. Shortly thereafter, Suave's counsel, who was unaware of the expert's meeting with Brooks, hired the expert to conduct Suave's survey. Brooks learned that Suave had retained the expert in

April of 1980, but did not file a motion to disqualify the expert until December 19, 1980, only a month before the trial. The district court conducted a hearing on the motion to disqualify, found that Brooks had never actually retained the expert and that there was no merit to Brooks' allegation that the expert had received confidential information, and thus ruled that the alleged conflict of interest should not prevent the expert from "testifying as to facts that are based on his education and experience and his conclusions based on those facts." Record on Appeal, vol. 3, at 779. Under the particular circumstances of this case, we find no error in the district court's ruling.

**17.** As noted in the text accompanying notes 11–13, *supra,* the district court's finding that Suave intentionally copied Brooks' "V" design is evidence on the secondary meaning issue. However, the weight to be accorded this evidence is lessened considerably by the fact that the district court also found that "the 'V' design and color schemes were fashionable and ... did not constitute a representation as to the origin of the shoes ... [and that] there is no proof that the Defendant intended to derive benefit from the *reputation* of the Plaintiff." 533 F.Supp. at 83 (emphasis in original).

Brooks also argues that the Patent and Trademark Office has determined that Brooks' "V" design has acquired secondary meaning and "is prepared to give final approval to [Brooks'] trademark application" as soon as Brooks files a consent agreement signed by Bata Shoe Company, which registered a similar design in 1971. Reply Brief for Plaintiff-Appellant at 11 (citing letter from U.S. Patent and Trademark Office, July 30, 1981). Aside from the fact that it is based on non-record evidence, Brooks' argument is not persuasive. Even if

Accordingly, we hold that the district court did not err when it concluded that Brooks' "V" design had not acquired secondary meaning as of January 1979.

The judgment of the district court is AFFIRMED.

the Patent and Trademark Office ultimately determines that Brooks' "V" design has acquired secondary meaning and registers the mark, that would not indicate that the design had acquired secondary meaning as of January 1979, the time period which is relevant for this case.