**BLUE CORAL, INC., Plaintiff,**

v.

**TURTLE WAX, INC., Defendant.**

**No. 87 C 1239.**

United States District Court,
N.D. Illinois, E.D.

May 21, 1987.

Marc O. Beem, R. Dickey Hamilton, Catherine H. McMahon, Miller Shakman Nathan & Hamilton, Chicago, Ill., Bruce O. Baumgartner, R. Scott Keller, Baker & Hostetler, Cleveland, Ohio, for plaintiff.

J. Patrick Herald, Baker & McKenzie, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

The plaintiff, Blue Coral, Inc., ("Blue Coral") has sued defendant Turtle Wax, Inc., ("Turtle Wax"), alleging trade dress infringement. The dispute centers around Blue Coral's newly introduced product "Wheel Magic" and Turtle Wax's newly introduced product, "All Purpose Wheel Cleaner," both universal wheel cleaning products. Blue Coral introduced its new product, Wheel Magic, at an August 1986 trade show. Shortly after that Turtle Wax also introduced as a new product in the United States its "All Purpose Wheel Cleaner." Turtle Wax for some time had a universal wheel cleaning product on the market in Europe under the trade name, "Wheel Brite."

Blue Coral had moved this Court to enter a very extensive temporary restraining order which, *inter alia*, would have prohibited Turtle Wax from using the current trade dress of its All Purpose Wheel Cleaner in any manner. We denied Blue Coral's motion for a temporary restraining order, but did order Turtle Wax to change the color of its spray caps from green and white to yellow and white so the caps did not duplicate the spray caps on Wheel Magic. Subsequently, we conducted a trial on Blue Coral's motion for a preliminary injunction against Turtle Wax. Having heard the oral testimony, read the written testimony and depositions, reviewed the paper evidence, physical exhibits, and considered the parties' legal memoranda, we enter the following memorandum opinion denying the motion for preliminary injunction. For the reasons stated below, we hold that Blue Coral has not satisfied the prerequisites for injunctive relief.

## FACTS [1]

Blue Coral and Turtle Wax are major "players" in the automotive appearance chemical market. They are major competitors in virtually all their various product lines. Their products include, but are not limited to, car washes, car and all purpose cleaners, car waxes, polishing compounds, color restorers, wheel and tire cleaners, protectants, bug and tar removers, and auto body sealers. If one player comes out with a "new" product, the other is very quick to follow with a "knock-off." A "knock-off" in the industry parlance is a competing product, not necessarily a look-alike product. Consequently, players will take steps to keep their new products secret from one another until the time when the product is officially launched. Frequently, although not always, a product will be launched at a key trade show. At the trade show the product will be shown to customers, customers in this case referring to the retail merchandisers, not the ultimate consumers. The key trade show for the automotive appearance chemical market is the Automotive Parts and Accessories Aftermarket Show (the "APAA" Show). Prior to the trade show it is not uncommon for competitors who intend to introduce a new product to show the product to key customers. Usually, key customers are the high-volume mass merchandisers such as WalMart or K-Mart. Because the success or failure of a new product can be tied so closely to its acceptance or rejection by these particular customers, players such as Blue Coral and Turtle Wax show proposed new products in the process of being developed to the mass-merchandisers for their feedback. For example, if the customer did not like a particular color combination in the trade dress, both Blue Coral and Turtle Wax would allow that to influence their ultimate choice of trade dress for their new products. The evidence clearly showed that if one of the key cus-

1. Pursuant to Fed.R.Civ.P. 52(a) this memorandum order shall serve as our findings of fact.

tomers told Blue Coral or Turtle Wax to jump, they did.

Since 1983, Turtle Wax had considered the possibility of introducing a universal wheel cleaner. At that time it marketed different wheel cleaners for different types of wheels.[2] Although Turtle Wax had an acceptable formula for a universal wheel cleaning product since August of 1985, it chose not to put it on the market for strategic reasons. Testimony indicated that a key goal of any company in this market is to get as many of its own SKU's (Stock Keeping Units) as possible on the retailer's shelf. An SKU is one individual product. From Turtle Wax's perspective, if it put a universal wheel cleaning product on the market, retailers would be reluctant to also stock the specialized cleaners. Thus, Turtle Wax would lose two SKUs just to place the universal cleaner on the market. Turtle Wax had prepared a mock-up or "comp" of a potential universal cleaner and had brought it to the 1985 APAA trade show to show selective customers, but not to officially introduce it. Apparently, the reception it received was not sufficient to overcome the possibility of losing SKUs already on the shelf. Thus, as of early 1986 Turtle Wax had put the universal cleaner on the back burner. In June of 1986, because of lackluster sales, Turtle Wax was reexamining its entire wheel care line, the "Power Brite" line. An external consultant advised Turtle Wax to drop the "Power Brite" name and play up the name of Turtle Wax and move to green bottles as a way of playing up the Turtle Wax brand use of green. The consultant also suggested that the introduction of a universal wheel cleaning product could help Turtle Wax get on retail shelves.

Although Turtle Wax and Blue Coral did not have universal wheel cleaning products on the market during early 1986, there were at least two and possibly five such products on the market. There was a German product, P–21–S, which was sold by Mercedes-Benz dealers; it was packaged in a translucent[3] plastic bottle with a green liquid. (Plaintiff's Exhibit 20–A). It is this product that gave Blue Coral the idea to push Wheel Magic as a special "German Formula" because one of the key ingredients was a "German" chemical. There was also a product put out under the Rain Dance name by Borden, Inc. (Plaintiff's Exhibit 17). Blue Coral also introduced into evidence three other products, which according to their labels are multi-purpose wheel cleaners: Mother's Wheel Mist (Plaintiff's Exhibit 28); Kit Wheel Cleaner (Plaintiff's Exhibit 19); and Meguiar's All Wheel (Plaintiff's Exhibit 18). Blue Coral introduced these products as evidence of the distinctiveness of Wheel Magic's trade dress, which would imply these products were all on the market prior to Wheel Magic.

Blue Coral's idea for a universal wheel care product originated in the spring of 1986 by Michael Moshontz, the president of Blue Coral when someone told him that Blue Coral's all purpose cleaner, Clear Magic, was a pretty good wheel cleaner. By the end of March, Blue Coral was considering various red trade dress designs utilizing a clear plastic bottle for its new universal wheel cleaner. Other than the German P–21–S product in the translucent bottle with a green liquid, there were no other specialized wheel cleaning products in a clear bottle with a colored liquid. During the approximately six month period during which the Wheel Magic trade dress developed, March—September 1986, Blue Coral considered various different approaches. It had an outside artist develop mock-ups of various color and bottle combinations for the Wheel Magic product, known as "comps" in the trade. It looked at red liquids in clear bottles with red labels, blue liquids with blue labels; opaque silver bottles with silver labels, opaque

---

**2.** As of the time of this lawsuit Turtle Wax had specialized cleaners for mag wheels, wire and chrome wheels, and aluminum painted wheels. Blue Coral, under its Espree line, had cleaners for wire wheels, custom and coated wheels, and mag wheels.

**3.** For purposes of this opinion we will use the term "translucent" to refer to bottles you can see through, but are cloudy; "opaque" to refer to bottles that you cannot see through, and "clear" to refer to bottles with plastic you can see through and are not cloudy.

black bottles with black labels, opaque white bottles with white labels and also a clear bottle with green liquid. The label itself went through numerous changes before arriving at the final version. (See Appendix A). Initially, the labels featured only a picture of a wheel. This was the direction the package was taking until the middle of July 1986 when the label changed drastically and moved to a "high tech" look, a high tech look is described by Blue Coral as involving the use of slanted letters and grids. The label now had five wheels instead of just one. All during this process, Blue Coral personnel had shown the comps to key customers and other employees and solicited their feedback. Apparently, Blue Coral received feedback which indicated it needed to go with a more modern high tech look, although none of the Blue Coral people could remember specifically who gave them this feedback.

As of mid-July 1986, however, Blue Coral had narrowed its choice of colors to green or red liquid in clear bottles with high tech labels. The green comp was almost identical to the current product and the red comp was the same in red. Blue Coral personnel then took these two bottles to key customers who favored the green presentation. Blue Coral decided to go with the green look and also had a hang tag made to go on the bottle neck. Initially, the tag was circular, but this was changed to a square sometime before this lawsuit. (See Plaintiff's Exhibit 50 # 28). Based on key customer reactions at this time, Blue Coral formalized its plans to introduce the Wheel Magic product in its green trade dress at the August 1986 APAA show.

Over in the rival camp, Turtle Wax was moving on its universal product at more of a turtle's pace. Turtle Wax had prepared a comp for an all purpose wheel cleaner in a white bottle with a blue and red label in the event a customer expressed an interest in a universal wheel cleaner. On July 16, 1986 Turtle Wax sales people met with WalMart, one of Turtle Wax's largest customers, to review their new product line. WalMart, indeed, expressed an interest in a universal wheel cleaning product. Apparently Blue Coral had been in the day before to see WalMart and had discussed the Wheel Magic product. The evidence was conflicting but apparently WalMart did not specifically mention that Blue Coral was coming out with a universal product. Nor did WalMart disclose any of the packaging of the Blue Coral product because it had not seen the actual packaging. WalMart expressed a great deal of interest in Turtle Wax's all purpose product conceptually, but did not like the graphics of the comp. WalMart suggested to Turtle Wax that it develop a more high tech approach to the packaging concept.[4] With this strong indication of interest for a universal wheel cleaning product from a major customer, Turtle Wax upgraded the priority of the new universal product. Turtle Wax, taking the outside consultant's recommendation to go with a green Turtle Wax family look for its entire wheel care line, began experimenting with different packaging concepts on the all purpose product. Between mid-July and mid-August, Turtle Wax looked at a variety of packaging alternatives including green opaque bottles and a clear bottle with green liquid. Although the design was not finalized and approved by top management, Turtle Wax sales personnel took a green opaque comp to the August 1986 trade show. Turtle Wax had decided not to introduce the new universal product to the gen-

---

4. There was contradictory evidence as to whether WalMart had been shown the green Wheel Magic packaging at the July 15th or 16th meeting with Blue Coral. Mr. Moshontz in his written testimony submitted to the court at trial indicated specifically that he had shown WalMart the green package on July 16th. However, in his deposition he was specifically asked which customers he had shown the proposed Wheel Magic packages to in mid-July. He remembered that he had shown a green and a red package to people from Shucks Auto Supply and Lucky Stores and he could not recall anyone else. If WalMart was such a key customer and if it had as much of a positive reaction to the product at that time as Mr. Moshontz claimed later at trial, we think Mr. Moshontz would have remembered showing the green trade dress to WalMart. Also, another Blue Coral employee, Jack Brookhart, indicated in his deposition that Mr. Moshontz showed the green comp to WalMart in early August and not before that date.

eral trade at the August trade show, but only to show it to selected key customers. The Turtle Wax All Purpose Cleaner comp was in a green opaque bottle with a green label with three wheels and a Turtle Wax logo. Turtle Wax showed the comp to the WalMart people at the show. The WalMart people liked the look better than the July version but still wanted Turtle Wax to go for a high tech look.

Meanwhile, Blue Coral introduced Wheel Magic at the trade show. Blue Coral claimed that the industry reaction at the show to Wheel Magic was extremely favorable but Blue Coral presented no evidence of this reaction other than testimony of its own people. There was no evidence that this was anything other than sales puff. Additionally, in his deposition Mr. Moshontz characterized his own statement to WalMart at the show that there had been a great reaction to Wheel Magic as "whatever bullshit I would throw out." Turtle Wax personnel never agreed that there had been any such favorable reaction. So, we do not know how the industry reacted to Blue Coral's Wheel Magic.

After Turtle Wax had talked to WalMart and other key customers at the August trade show about the All Purpose Wheel Cleaner product comp, it decided to change the direction on the green comp and go for a more high tech look. In preparation for a sales call to WalMart in early September of 1986, Turtle Wax's Art Department developed a new comp which utilized a more "high tech" label. The label had multiple wheels and tires with yellow halos around them to reflect the all purpose nature of the product, the name of the product was identical to the current product and it had a silver Turtle Wax logo at the top of the label, also identical to the current label. The label also had a grid in the background. The bottle shape was the same as the original green comp, but was now clear and the green liquid was visible. The spray cap was white with green trim. At the September 10, 1986 meeting with WalMart the comp was received well and Turtle Wax decided to go ahead with the pro-

duction and development of the trial packaging graphics in order to prepare for release of the product in late 1986. The final version of the label was only slightly different. (See Appendix A). The art and marketing people who developed the graphics on the Turtle Wax product had not seen Blue Coral's Wheel Magic trade dress prior to developing their own package.

Although Turtle Wax sales personnel had seen Wheel Magic at the August trade show, we find that Turtle Wax did not intentionally copy any elements of the Blue Coral trade dress. We find that the Turtle Wax All Purpose Wheel Cleaner trade dress was the result of independent design. Apparently both parties wanted a high tech look to satisfy their customers. Blue Coral's artist testified that the high tech look consists of grids, bold slanted lettering and bright colors. Thus, it was inevitable that there would be common elements in the two labels. Turtle Wax chose to put its universal product in a clear container with the color of the liquid showing through to emphasize its uniqueness as a universal cleaner in the new family look of Turtle Wax's wheel and tire care line. In developing the family look graphics for its mag wheel cleaner, wire and chrome wheel cleaner, aluminum and painted wheel cleaner, whitewall tire cleaner and its silicone tire cleaner, Turtle Wax used the green opaque bottle it had used at the August trade show.[5] The labels are very similar to the All Purpose label except that they feature the type of wheel the product cleans.

When Blue Coral and Turtle Wax hit the sales trail in the fall of 1986 to push their products, their respective pricing strategies became an issue. Blue Coral wanted to position Wheel Magic as an "upmarket" premium product with a price higher, and greater profit return for Blue Coral, than on its other wheel care products. Ostensibly, this was justified because of the sale's appeal of the exclusive German ingredient in the formula. Although when asked, the president of Blue Coral could not remember what that important ingredient was. Turtle Wax, on the other hand, decided to

---

**5.** The only exception is the whitewall tire cleaner which is in a white bottle.

price the All Purpose Wheel Cleaner at the same price as its other wheel cleaning products. This proved to be a very attractive proposition to the retailers. This allowed them to bring in the all purpose product at the same price as the specialized cleaners and save valuable shelf space by dumping the other specialized cleaner's SKUs. Apparently because of limited shelf space some retailers are unlikely to stock more than one brand of wheel cleaner. Thus, inevitably, a few customers complained to Blue Coral that Turtle Wax had the same product at a much more reasonable price, which forced Blue Coral to lower its price on its Wheel Magic. Although Blue Coral tried to prove that the customers acted this way only because of the purported similarity in the trade dress of Wheel Magic and the All Purpose Cleaner, we do not so find. There was no evidence of retailers' intent from retailers. It seems much more likely that the high price caused the pressure. The key consideration to the retailer is the price. If a retailer has space for two competing products it will stock them. When it only has space for one product it will stock the item that will be most profitable. If the retailers thought Wheel Magic would sell to consumers at the higher price, there would not have been pressure to lower the price.

### Packaging of Wheel Cleaners and Other Automotive Appearance Chemicals

Other than the German P–21–S product in the translucent bottle, no other tire and wheel cleaner had been packaged in a clear bottle when Wheel Magic was introduced. There were, however, many different automobile appearance chemicals that were packaged in clear bottles and sold on the shelves next to the tire and wheel cleaners. As a matter of fact, Turtle Wax titled its August 1985 trade show brochure "Blast into the Clear" to emphasize Turtle Wax's movement to clear packaging. Blue Coral has at least two automotive appearance chemical products that it packages in clear bottles. The first is appropriately called "Clear Magic." The other is a glass cleaner. It was the Clear Magic formula upon which Wheel Magic formula was based.

The use of a clear bottle with a green liquid was also not novel in the automobile appearance chemical market. Although Blue Coral had never had such a product, Turtle Wax had its Turtle Wax Hard Shell Car Wax, its Turtle Extra Paste Wax, its one step wash and wax concentrate, its Zip wax car wash (with green crystals), and its original Turtle Wax auto polish all in clear or clear green bottles with green liquids. Another automotive appearance chemical product, Simple Green,[6] uses the green liquid with the clear bottle extensively. Simple Green is sold in a number of different sizes but from the pictures submitted of the various store shelves, it is predominately sold in a 24 oz. spray top bottle. In this trade dress, Simple Green and Wheel Magic trade dresses are very similar. (See Appendix B). There was, however, no evidence that Blue Coral intended to copy the Simple Green look in developing the Wheel Magic trade dress. The green color of the liquid is identical to Wheel Magic's liquid. The spray caps are identical to the lay eye, white with a green top, neck, nozzle, and trigger. Each have yellow hang tags, although Simple Green's is circular and Wheel Magic's is square.[7] The label contains slanted lettering with the product

---

6. Blue Coral attempted to prove that Simple Green is just a household cleaning product. Its evidence, however, proved that Simple Green clearly was not a household cleaning product. Blue Coral hired a private investigator to randomly visit stores that might stock Wheel Magic or Simple Green to see how Simple Green was displayed, whether it was in the household sections with such all purpose cleaning products as Fantastik or Grease Release or if it was in the automotive section with car polishes, waxes and other car cleaning items. The investigator visited 30 stores and twenty of them carried Simple Green. Of the twenty with Simple Green, 18, or

90%, carried it in the automotive section. Additionally, there was evidence that Simple Green shows its product at the APAA trade show. Also, Blue Coral's admittedly competitive product to Simple Green, Clear Magic, is prominently displayed in Blue Coral's catalog right along with Blue Coral's car waxes, polishes, and wheel cleaners.

7. Wheel Magic originally had a circular tag also, but this was changed sometime before this lawsuit.

name in bold sans serif lettering. The only differences are the pale grid and wheels on the Wheel Magic label. Although Blue Coral does not consider Simple Green a competitive product to Wheel Magic, we find that Simple Green would be an adequate substitute for a pennywise consumer looking for something to clean her wheels. Simple Green advertises itself, among other things, as a wheel cleaner. It even has a picture of someone using it to clean wheels in a promotional card in its sales book which was entered into evidence from discovery obtained from Blue Coral. In terms of its presentation to the consuming public, Simple Green is usually sold on the same shelving area as Wheel Magic and other automotive appearance chemicals. Occasionally, the two products are even sold side by side. If a consumer were to head into the automotive section to look for a wheel cleaning product she would very likely look through the all purpose cleaners such as Simple Green and Clear Magic before finding the section for wheel cleaners. If the consumer were to pick up from the shelf and examine the Simple Green bottle, she would find that the print label describes in part Simple Green as an "automotive ... degreaser." The back label adds in part: "Automotive: ... Cleans the car inside and out—including ... chrome wheels...." Simple Green has been on the market for five years and appears to be a very popular product judging from the number of stores that stocked it in Blue Coral's survey.

### Evidence of Consumer Confusion

There was no evidence, however, that any consumers had ever mistaken Wheel Magic for Simple Green, just as there was no evidence that consumers or retailers had mistaken Turtle Wax's All Purpose Wheel Cleaner for Wheel Magic. There was also no evidence that the Wheel Magic trade dress had acquired secondary meaning to consumers. This, of course, is to be expected considering that Wheel Magic had only been shipped for direct sale to consumers in December 1986. It was only on the store shelves a very short time before Turtle Wax's All Purpose Wheel Cleaner

was available on the shelf. Nor was there evidence that Blue Coral had launched Wheel Magic with an extensive advertising program aimed at the ultimate consumers.

### DISCUSSION

Blue Coral contends that Turtle Wax has improperly appropriated its Wheel Magic trade dress under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982). Therefore, Blue Coral seeks a preliminary injunction to prohibit Turtle Wax from using its current trade dress for its All Purpose Wheel Cleaner. In order to be entitled to a preliminary injunction Blue Coral must demonstrate the following: (1) that it has no adequate remedy at law and irreparable harm; (2) that it has some likelihood of success on the merits; (3) that the balance of relative harms weighs in its favor; and (4) that the public interest will not be disserved if the injunction issues. *A.J. Canfield Co. v. Vess Beverages, Inc.,* 796 F.2d 903, 906 (7th Cir.1986).

"Trade dress" is a commonly used term in the law of unfair competition which denotes the form in which a producer presents his brand to the market; thus a label, a package, even the cover of a book might be trade dress. *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604, 608 (7th Cir.1986). If a seller adopts a trade dress confusingly similar to a competitor's, this is unfair competition actionable under section 43(a). *Id.* However, before a manufacturer can sue for trade dress infringement, its trade dress must be protectable as a trademark. In order to protect the Wheel Magic trade dress, Blue Coral must establish that: its Wheel Magic trade dress is "inherently distinctive" or has acquired a secondary meaning to consumers, *Vaughan Manufacturing Co. v. Brikam International,* 814 F.2d 346, 348 (7th Cir. 1987); *Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.,* 781 F.2d 604, 608 (7th Cir.1986). Next Blue Coral must prove that the Turtle Wax All Purpose Wheel Cleaner trade dress creates a likelihood of confusion on the part of consumers as to the source of that product. *Horn Abbott Ltd. v. Sarsa-*

parilla Ltd., 601 F.Supp. 360, 365 (N.D.Ill. 1984).

### Protectability of The Wheel Magic Trade Dress

■ As noted above, in order to protect the Wheel Magic trade dress, Blue Coral must prove either that the trade dress has acquired secondary meaning or that the trade dress is inherently distinctive. Blue Coral has presented no evidence that the Wheel Magic trade dress has acquired a secondary meaning.[8] The Seventh Circuit, however, has indicated that proof of intentional copying is probative evidence of secondary meaning. Vaughan Manufacturing Co., 814 F.2d at 349. However, as Judge Posner made clear in Blau Plumbing, proof of intentional copying alone does not eliminate the need for additional proof of secondary meaning. Blau Plumbing, Inc., 781 F.2d 604, 611 (citing Brooks Shoe Mfg. Co. v. Suave Shoe Corp., 716 F.2d 854, 859–60 (11th Cir.1983)). Nevertheless, because we found that Blue Coral failed to prove Turtle Wax intentionally copied the Wheel Magic trade dress, Blue Coral cannot rely on any implication to help prove secondary meaning. Thus, the Wheel Magic trade dress will only be protectable as a trademark if it is "inherently distinctive." Vaughan Manufacturing Co., 814 F.2d at 348. The Seventh Circuit has not identified what we should look to in deciding whether a trade dress is "inherently distinctive." A review of the case law which has established the protectability of trade dress in the absence of secondary meaning reveals two different tests to apply.

### The Chevron Test

■ The case which initiated the rule of protectability of inherently distinctive trade

dresses in the absence of secondary meaning was Chevron Chemical Co. v. Voluntary Purchasing Groups, 659 F.2d 695 (5th Cir.1981).[9] In Chevron, the plaintiff was unable to prove secondary meaning for a particular trade dress despite the fact that the product had been on the market in the dress trade for over five years. The Fifth Circuit treated the rather simple trade dress of Chevron's product as a common law trademark and found that the colors of the trade dress presented in Chevron's particular geometric pattern created a distinctive visual impression. Id. at 703. The court concluded that a trade dress which was "arbitrary and serve[d] no function either to describe the product or assist in its effective packaging," Id. at 702, would be protectable absent a finding of secondary meaning. Chevron would therefore indicate that we must determine whether 1) the trade dress is "arbitrary," and 2) serves no function to either describe the product, or 3) assist in its effective packaging. In our case, the purely arbitrary features of the Wheel Magic trade dress are the green color of the liquid, cap, and label; the clear plastic of the bottle and its actual shape; and the size of the lettering. The use of a spray bottle itself is purely functional, although not its shape. The use of the high tech grid is descriptive of the advanced high tech nature of the product.[10] The pictures of the wheels are descriptive of the purpose of the product. Finally, the use of the hang tag is predominantly functional, as the testimony indicated that its purpose was to set forth all the additional information about Wheel Magic that did not fit on the label. Thus, under the Chevron test, because some of

---

8. "Secondary meaning" denotes an association in the mind of the consumer between the trade dress of a product and a particular producer. A.J. Canfield Co. v. Vess Beverages, Inc., 796 F.2d 903, 907 (7th Cir.1986).

9. Chevron was cited approvingly by the Seventh Circuit in Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc., 781 F.2d 604, 608 (7th Cir.1986).

10. A term or feature is merely descriptive if it specifically describes a characteristic or an ingredient of a product. A.J. Canfield Co. v. Vess

Beverages, 796 F.2d 903, 906–07 (7th Cir.1986). The finding that the high tech look is descriptive and not arbitrary rests upon Blue Coral's representation that Wheel Magic is indeed an advanced high tech formula. If Wheel Magic is not an advanced high tech formula and is nothing more than Clear Magic with green coloring, it may be the case that a high tech look would only be arbitrary and not descriptive. Absent such proof, the high tech look is descriptive in this case.

the elements of the trade dress are nonarbitrary and functional, it would appear that the Wheel Magic trade dress is unprotectable absent secondary meaning.

### The Seabrook Test

The Eleventh Circuit has recently used a test which originated from the United States Court of Customs and Patent Appeals to identify whether a trade dress is "inherently distinctive." *See, e.g., AmBRIT, Inc. v. Kraft, Inc.*, 805 F.2d 974, 979 (11th Cir.1986), *review denied,* — U.S. ——, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987); *Brooks Shoe Manufacturing Co. v. Suave Shoe Corp.*, 716 F.2d 854, 858 (11th Cir. 1983). In *Seabrook Foods, Inc. v. BarWell Foods Ltd.*, 568 F.2d 1342, 1344 (C.C. P.A.1977), the court set forth the key factors to consider when determining whether a design for a trademark is inherently distinctive. *Seabrook* indicated we should decide whether it was a "common" basic shape or design, whether it was unique or unusual in a particular field, or whether it was a mere refinement of commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods. *Seabrook*, 568 F.2d at 1344. Before applying this test to the evidence presented to the Court, we must decide to which "particular field" or "class of goods" we should compare Wheel Magic. Throughout trial, Blue Coral tried to prove that we should only consider wheel cleaners and no other automotive appearance chemical. Blue Coral presented evidence that retailers, not the ultimate consumers of Wheel Magic, treat wheel cleaners as a discrete product line and shelve all wheel cleaners in a small section of a shelf for automotive appearance chemicals with only wheel cleaners. There was, however, evidence that this was not always done.

There was also evidence that the wheel cleaners were always in the same shelving area as the other automotive appearance chemicals, such as car polishes, waxes, washes, etc. Thus, when an average consumer tried to find a wheel cleaner, she would be presented with an array of car polishes, waxes, all purpose cleaners, rubbing compounds, and tire cleaners spanning the entire automotive appearance chemical spectrum. Because there was no evidence that retailers had been confused as to the manufacturer of Wheel Magic or Turtle Wax's All Purpose Wheel Cleaner, it is the perception of the ultimate consumer we need to be concerned with. Accordingly, we find that it is the automotive appearance chemicals as one group or class of goods from which we need to decide whether the Wheel Magic trade dress is "inherently distinctive." This conclusion is supported by *Seabrook Foods, Inc. v. BarWell Foods Ltd.*, 568 F.2d 1342, 1345 (C.C. P.A.1977), where the court indicated that for purposes of determining whether plaintiff's trademark on frozen fruits and vegetables was inherently distinctive it could look to third parties' use of the mark on all frozen foods.

The first factor we need to consider is whether the Wheel Magic trade dress is of a common, basic shape or design in the automotive appearance chemical field. The basic shape and design of the trade dress is a clear plastic spray top bottle with a label. The evidence showed that Blue Coral has two products which are packaged this way, Clear Magic, an all purpose cleaner, and Westley's Glass Cleaner, for home and auto. Both of these products are sold in the automotive appearance chemicals section. Simple Green, another all purpose cleaner, is also packaged this way in its 24 oz. bottle. Super Poly, a Simoniz product, is packaged in a box with a picture on the front of it in a clear bottle with a blue liquid (Plaintiff's TE 63). While these are the only four products packaged in clear plastic bottles of the same general shape as the Wheel Magic bottle with spray tops, there are numerous products in different shaped clear bottles and others that use solid color bottles, but are otherwise the same. Although, there are no other wheel cleaners in clear bottles shaped like Wheel Magic's bottle, there are numerous solid color bottles of the same general shape used for other wheel cleaners. We think this lends support to our conclusion that

the basic shape and design of the Wheel Magic trade dress is common.

The second factor we must consider is whether the Wheel Magic trade dress is unique or unusual in its particular field. We think the existence of the Simple Green trade dress, which is virtually identical except for the labels, prevents the Wheel Magic trade dress being considered "unique" in the automotive appearance chemicals field.[11]

The final factor we need to consider is whether the Wheel Magic trade dress is a mere refinement of a commonly adopted and well known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods. We find that the Wheel Magic trade dress is merely such a refinement. Even if we were to look only at wheel cleaning products, it is clear that Blue Coral has only refined the type of trade dress already used by other manufacturers of wheel cleaning products. The major refinement present in the Wheel Magic trade dress is the use of a clear plastic bottle. Previously, only the German P-21-S product had utilized a translucent bottle with green liquid. Blue Coral took the translucent bottle and made it clear. It was only a matter of time before other makers of wheel cleaners ventured on to the shelf with clear bottles. Turtle Wax had previously used different shaped clear bottles for a number of its automotive appearance chemical products, as had other manufacturers, including Blue Coral. It would be dangerous precedent to allow the first user of a particular type of packaging to forever bar second comers from using it. Other than the use of a clear bottle,[12] we do not find that the Wheel Magic trade dress is all that different than other wheel care products on the market. For example, the Eagle One brand wheel cleaners utilize the same high tech look of slanted lettering and give the illusion of a grid with the use of multiple slanted lines across the packaging (Plaintiff's Exhibits 23, 25). The use of a colored liquid was not new, as the German P-21-S product already used a green colored liquid.[13] Also Blue Coral had already used split color spray tops on opaque white bottles identical to the Wheel Magic trade dress.

If we were to compare the Wheel Magic trade dress to all of the automobile appearance chemical products, it is even clearer that it is merely a refinement of commonly adopted and well known form of ornamentation for such goods. There are dozens of such products marketed in spray bottles with bright colors. Not all such products come in clear spray bottles, however, there are many in clear bottles of different shapes.

### The Basic Question of Fact

Finally, regardless of what case law factors are appropriate, we still must resolve the basic question of fact: whether the Wheel Magic trade dress is "inherently distinctive" sufficient to protect the trade dress the instant the trade dress is on the market. After reviewing all the evidence presented to us, we are unconvinced that it is inherently distinctive.

Trade dress protection is much more extensive than trademark protection, 1 J.T. McCarthy, *Trademarks and Unfair Competition* § 8:1 (2d ed. 1984). Trademark protection is limited to comparing just one

11. Additionally, we note that we found that Simple Green is an adequate substitute for wheel cleaners and therefore, we could also consider Simple Green in the wheel cleaner product line and not just the automotive appearance chemical market.

12. Again, although it is an adequate substitute for, and holds itself out as, a wheel care product, for purposes of this discussion, we are not considering clear-bottled Simple Green as a wheel care product.

13. Blue Coral attempted to downplay this fact by showing that P-21-S was sold and packaged in a blue and grey box. We find this does not take away from the fact that Blue Coral has merely refined some of the P-21-S features. Additionally, in the deposition testimony Blue Coral executives consistently referred to the product as a green liquid. Without specific evidence that this product was never shown in any manner other than in the box, we find it reasonable to conclude that consumers of this particular product would have had occasion to see it outside of its box.

aspect of plaintiff's product with one aspect of the defendant's product, that is, the use of the trademarks. For trade dress infringement we are to compare the overall impression of the two trade dresses. The idea behind such extensive protection is to prevent a second comer from free riding on the first comer's efforts to win consumers. *Cf. Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1430 (7th Cir.1983). In order to insure that this extensive protection is properly used, the first comer has to prove the existence of secondary meaning. That is, that the consuming public had come to identify the first comer's trade dress with the first comer. This insured the evil sought to be protected against, free riding on another's efforts, was addressed. Obviously, if the consuming public had never come to associate the first comer's trade dress with the first comer, the consuming public would not be unfairly confused when the second comer put its product on the market even if that product was confusingly similar to the first comer's.

Later development of this doctrine allowed trade dress protection in the absence of secondary meaning if the first comer's trade dress was inherently distinctive. *See, e.g., Chevron Chemical Co. v. Voluntary Purchasing Groups*, 659 F.2d 695 (5th Cir.1981). This followed the case law for trademarks which allows protection of "inherently distinctive" trademarks upon first use. *Chevron*, 659 F.2d at 702. Such protection is granted to trademarks because the mark has no meaning absent the use by the originator of the mark. With trademarks it is fairly easy to determine what is an "inherently distinctive" trademark. For example, the use of Exxon or Kodak as a company name is "inherently distinctive." These are made-up words that had no meaning until a company decided to use them. Thus, if a second comer tried to use a name confusingly similar, it would be unfair competition. It is a fairly simple process to compare one arbitrary made-up name with another arbitrary made-up name. The process is not that simple when it applies to comparing one trade dress with another. A complete trade dress can be made up of many different functional elements such as a bottle, a spray cap, and a label. It may also be made up of many descriptive elements such as pictures of the items the product cleans, as in this case wheels, or the descriptive use of high tech graphics to describe the modern advanced nature of the product. The trade dress may also incorporate truly arbitrary elements such as in the Wheel Magic trade dress the color of the packaging, the color of liquid, and the use of clear rather than an opaque bottle. Thus, we are to take these many varied elements and decide if together they create an inherently distinctive trade dress. This is not as easy of a process as comparing one arbitrary made-up word with another. Thus, in deciding whether a trade dress is inherently distinctive, we look at the overall impression of the various elements but we still must consider how unique this new compilation is in comparison to what is already in the field. This will necessarily encompass a consideration of the various elements, otherwise every trade dress would have instant protectability that exceeds even trademark protection. This protection would extend to aspects of a trade dress that if used as a trademark could not be protected absent secondary meaning, such as descriptive elements and functional elements. Thus, the declaration that a trade dress is inherently distinctive should be carefully considered.

We have so carefully considered whether the Wheel Magic trade dress is inherently distinctive and we do not find that it is. It is different in degree from other products on the market, wheel cleaners and automotive appearance chemicals, but it is not different in kind.

In conclusion, we find that the Wheel Magic trade dress is not entitled to trademark protection because there was no evidence of secondary meaning and the trade dress is not inherently distinctive. Therefore, Blue Coral has not demonstrated any likelihood of success on the merits.

### *Likelihood of Confusion*

Because we have found that Blue Coral is not entitled to instant trade dress protec-

tion for its Wheel Magic trade dress we need not consider the issue of likelihood of confusion. We observe, however, that for purposes of granting an injunction we can consider the voluntary discontinuation of an alleged infringement. *M–F–G Corp. v. EMRA Corp.,* 817 F.2d 410, 411 (7th Cir. 1987). In this case Turtle Wax has voluntarily agreed to continue to market its All Purpose Wheel Cleaner with a different spray cap as used on Defendant's Exhibit 34. We find that the use of this new white cap with a yellow nozzle, trigger, and neck sufficiently changes the appearance of the All Purpose Wheel Cleaner trade dress so as to defeat any claim of similarity of trade dress.

In conclusion, we deny Blue Coral's motion for a preliminary injunction because it has failed to show there is a likelihood of success on the merits. It is so ordered.

APPENDIX A