**LISA FRANK, INC., an Arizona corporation, and Stuart Hall Company, Inc., a Missouri corporation, Plaintiffs,**

v.

**IMPACT INTERNATIONAL, INC., a Pennsylvania corporation, Style Club, Inc., a Florida corporation, Kenneth Litvack, an individual, Barry Silberman, an individual, Leslie Silberman, an individual, and Cleta Magyar, an individual, Defendants.**

No. Civ. 91–725.

United States District Court, D. Arizona.

Aug. 13, 1992.

984

Kirk M. Hallam, Rosenfeld, Meyer & Susman, Beverly Hills, Cal., Ronald J. Stolkin, Karp, Stolkin & Weiss, P.C., Tucson, Ariz.; Susan E. Holley, Beverly Hills, Cal., on briefs, for plaintiffs.

Roberta Jacobs–Meadway, Panitch, Schwarze, Jacobs, Philadelphia, Pa., Sandra S. Froman, Snell & Wilmer, Tucson, Ariz., for defendants.

## ORDER

BILBY, District Judge.

### I. INTRODUCTION

Plaintiffs Lisa Frank, Inc. ("LFI") and Stuart Hall Company, Inc., seek a preliminary injunction to prevent distribution of certain products produced by Defendants Impact International, Inc. ("Impact") and Style Club, Inc. ("Style Club"), a wholly owned subsidiary of Impact. In this motion, Plaintiffs contend that they are likely to succeed on the merits of their claims for trade dress and copyright infringement. Plaintiffs seek to protect the following products: Stamp Head Pen; Stamp Heads; Square Doods Pen; Color Your Own Stickers; and Color Your Own Easter Stickers. Plaintiffs additionally seek protection of the LFI Halloween product line, consisting of Halloween Erasers, Halloween Frightening Rings, Halloween Pencils, Halloween Tracing Shapes, Halloween Coloring Book, Halloween Goolish Stencils, and Halloween Stickers.

Plaintiffs' Motion for Preliminary Injunction seeks to enjoin from distribution the following products produced by Defendants: Stylin Stamper, Romance Roller, Ring Stampers, Wheelies Roller Stamps, Charmerz, Grooverz, Wild Writers pencils, Dazzlerz Pens, and Color–In Easter Stickerz. The Halloween line at issue consists of the following products: Tricky Treats Creepy Rings, Monster Pencils, Tricky Treats Eerie Erasers, Monster Bubble Heads, Monster Squirter, Monster Erasers, Monster Flicker Stickers, Monster Peely Pals, Monster Trace–Its, Monster Stampers, Tricky Treats Spooky Trace–Its, Tricky Treats Spooky Jewel Stickers, Tricky Treats Spooky Stamp Kit, Tricky Treats Grooverz Pencils, Tricky Treats Spooky

Memo Pads, Tricky Treats Spooky Stickers, Tricky Treats Pumpkin Heads, and Tricky Treats Decorate Your Own Eye Mask.

## II. FACTUAL HISTORY

In 1979, Lisa Frank founded Lisa Frank, Inc. for the purpose of designing and distributing stationery products. The LFI product line consists of brightly colored novelty stationery items designed for young girls between the ages of 4 and 12. Use of vibrant color combinations and graphics are commonly employed in both the LFI products and packaging. In addition, LFI markets seasonal lines of novelty stationery products, such as products with Easter and Halloween motifs. During LFI's initial years, products were sold through a national network of gift stores. In 1984, LFI began to distribute products to national mass merchandising chains, such as Wal–Mart, K Mart, Target, Toys 'R Us, Walgreens, and Pharmor. Since LFI's inception, sales have rapidly multiplied. In 1991, LFI sold in excess of $20 million worth of goods.

In 1987, Defendant Kenneth Litvack ("Litvack") and Gary Albert founded Impact. Impact began by distributing LFI products under a licensing agreement. Litvack declined to renew his license and soon after developed a line of children's stationery and novelty items, including seasonal lines. These products are distributed under the Style Club logo. In addition, Impact intends to release a Halloween product line containing many products similar to those sold by LFI. The halloween line is marketed under two lines, referred to here as the "Tricky Treats" and "Universal Studios Monster" products. Impact markets these products through the same marketing channels as LFI. For 1992, Impact's annual sales of novelty stationery items and school supplies are expected to exceed $12 million.

On December 11, 1991, Plaintiffs filed the instant action. In the First Amended Complaint, Plaintiffs raise claims for copyright infringement, pursuant to sections 102(a) and 501 of the Copyright Act of 1976 ("Copyright Act"), 17 U.S.C. §§ 102(a) and 501; trademark infringement, pursuant to section 32(1)(a) of the Lanham Trademark Act of 1946 ("Lanham Act"), 15 U.S.C. § 1114; trade dress infringement, pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition, pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and a number of related state law claims.

For purposes of this motion, only the trade dress and copyright claims are addressed. The particular facts are discussed within the context of the issues below.

## III. STANDARD FOR ISSUANCE OF PRELIMINARY INJUNCTION

To qualify for a preliminary injunction, Plaintiffs must demonstrate either: (1) A combination of probable success on the merits and the possibility of irreparable harm; or (2) that serious questions are raised as to the merits and the balance of hardships tips sharply in the moving party's favor. *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987) (citing *Sardi's Restaurant Corp. v. Sardie*, 755 F.2d 719, 723 (9th Cir.1985); *Apple Computer, Inc. v. Formula Int'l Inc.*, 725 F.2d 521, 523 (9th Cir.1984)). "These are not two distinct tests, but rather the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" *Rodeo Collection*, 812 F.2d at 1217 (quoting *San Diego Comm. Against Registration And The Draft v. Governing Bd. of Grossmont Union High School Dist.*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986)).

## IV. ANALYSIS

### A. PROBABILITY OF SUCCESS ON THE MERITS OF TRADE DRESS CLAIM

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[1] provides protection for a

---

1. Section 43(a) provides, in pertinent part:

Any person who shall affix, apply, or annex, or use in connection with any goods or servic-

broad range of deceptive practices in commerce. *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1505 (9th Cir.1987). Under the section 43(a) umbrella, a manufacturer may seek protection for the appearance of its products—referred to as the product's "trade dress." "Trade dress" may include features of the product, such as its "size, shape, color, color combinations, texture, or graphics." *Id.* at 1506.

Plaintiffs depict LFI's products and trade dress as follows:

> [M]ass merchandised, designer stationery and novelty products for young girls, comprised of full lines of unique seasonal products, displaying graphics, colors and extraordinary color combinations with a high degree of detail, and crisp, precise and bold design colors[, including use] ... of rainbow colors that gradually fade into one another along the package or product.

Plaintiffs' Motion for Preliminary Injunction, at 9–10 (filed July 2, 1992). This description generally describes the trade dress across the LFI product line.[2] Closer inspection of the products at issue reveals that LFI may maintain a number of trade dresses. In particular, for purposes of this motion, a separate dress may be recognized for the following product groups: 1) Color Your Own Stickers and Color Your Own Easter Stickers; 2) the LFI Halloween line; and 3) Stamp Heads, Doods and related pencil/pen products.

■ "A plaintiff seeking to recover for trade dress infringement under section 43(a) must show that its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers." *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 841 (9th Cir.1987); *quoted in Rachel,* 831 F.2d at 1506. That is, a manufacturer is entitled to protection where the trade dress is non-

functional, has acquired secondary meaning, and the allegedly infringing product is likely to cause confusion among consumers. *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1381 (9th Cir.1987); *Fuddruckers,* 826 F.2d at 841; *Rachel,* 831 F.2d at 1506.

### 1. *Functionality*

■ "A product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 851 n. 10, 102 S.Ct. 2182, 2187 n. 10, 72 L.Ed.2d 606 (1982); *Fuddruckers,* 826 F.2d at 842. Functional elements that are separately functional, and hence unprotectable, may be protected together as part of a product's trade dress. *Id.* In other words, the "inquiry is not addressed to whether individual elements of the trade dress fall within the definition of functional, but to whether the whole collection of elements taken together are functional." *Id.; First Brands,* 809 F.2d at 1381 ("[i]n determining functionality, a product's trade dress must be analyzed as a whole").

■ In this circuit, the burden of proof is on Plaintiffs to prove that the trade dress is non-functional. *Rachel,* 831 F.2d at 1506. Plaintiffs contend that LFI's trade dress is primarily comprised of non-functional, aesthetic elements, such as colors and artistic graphic designs. According to Plaintiffs, the artwork, designs and overall visual appearance of each product is aesthetically pleasing and could be presented in a wide variety of shapes, styles and expressions.

In opposition, Defendants raise a number of contentions. Defendants first assert that Plaintiffs' claims are "nonsensical,"

---

es, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same ... shall be liable to a civil action by any person ... who believes that he [or she] is or is likely to be damaged by the use of any false description or representation.

15 U.S.C. § 1125(a).

**2.** Because the LFI trade dress is made up of a distinct overall visual impression, and not any one particular element, the Court shall not require Plaintiffs to describe each and every element encompassed in the LFI trade dress.

and that LFI "resents" and "seeks to stifle" Impact's competition in the industry. These arguments provide no assistance to the Court in assessing the merits of Plaintiffs' claims and therefore shall be disregarded. Defendants next contend that the LFI trade dress is functional because the use of multiple colors and graphics is common in the juvenile stationery industry and is deemed necessary to catch the eye of juvenile and teen-age purchasers. In other words, Defendants submit that the aesthetic appearance of the LFI products and packaging has become functional in the industry—referred to as "aesthetic functionality."

In this circuit, however, the "aesthetic functionality" test has been rejected in favor of the "utilitarian" functionality approach. *First Brands*, 809 F.2d at 1382 n. 3. Here, Plaintiffs do not seek protection of the product itself—i.e., a pencil, a pen, or stickers. Under the utilitarian test, these items are clearly functional in nature. Rather, Plaintiffs seek protection of the aesthetic elements and overall visual appearance of the LFI product line. While Plaintiffs cannot prevent Defendants from using any particular color or feature, they can protect a combination of visual elements "that, taken together, ... may create a distinctive visual impression" and is likely to confuse consumers. *Fuddruckers*, 826 F.2d at 842 (quoting *Falcon Rice Mill v. Community Rice Mill*, 725 F.2d 336, 346 (5th Cir.1984)) (quoting *Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703 (5th Cir. 1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982)); *see also Hartford House, Ltd. v. Hallmark Cards, Inc.*, 846 F.2d 1268 (10th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988) (overall appearance of greeting cards afforded trade dress protection). Defendants have available to them a multitude of design alternatives that can be utilized in an endless number of combinations. Defendants can effectively compete in the market without simulating the LFI trade dress. *See Hartford House*, 846 F.2d at 1274.

Defendants next assert that the packaging employed by both LFI and Impact is functional, and as such, cannot be afforded trade dress protection. In particular, Defendants contend that the use of blister cards or polybags with header cards is necessary for the effective display of products on store racks. In particular, the card is sized so as to make efficient use of store space and the use of polybags provide purchasers with an unobstructed view of the product. In addition, Defendants assert that the packaging of pencils on the right side of a blister card, accompanied with text on the left, is also functional because consumers read from left to right.

While Plaintiffs cannot prevent Defendants from using blister cards, polybags, or header cards *per se*, they may—if infringement is shown—enjoin a specific combination of elements contained in the package, product and design that make up the LFI trade dress. The elements that make up the LFI trade dress must be looked upon in its entirety. "Viewing the elements as a whole does not result in monopoly protection for necessary elements." *Fuddruckers*, 826 F.2d at 842 n. 7.

Accordingly, the Court finds that the elements that make up the LFI trade dress—taken as a whole—are non-functional, and hence, may receive protection if both secondary meaning and likelihood of confusion are present.

### 2. *Inherent Distinctiveness/Secondary Meaning*

Plaintiffs contend that they need not establish secondary meaning because their trade dress is "inherently distinctive." In the alternative, Plaintiffs assert that the LFI trade dress at issue has developed secondary meaning.

#### a. Inherent Distinctiveness

Relying upon the recent United States Supreme Court decision in *Two Pesos, Inc. v. Taco Cabana, Inc.*, —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992), Plaintiffs assert that secondary meaning need not be proven here because the trade dress is "inherently distinctive." In *Two Pesos*,

*supra,* the United States Supreme Court addressed the issue of whether the trade dress of a restaurant may be protected under section 43(a) of the Lanham Act based on a finding of inherent distinctiveness, absent proof that the trade dress had established secondary meaning. The Court began by reviewing section 43(a) as applied to trademarks. In this context, secondary meaning need not be proven in cases involving inherently distinctive marks.[3] The Court found no textual basis under the Lanham Act for distinguishing between trademark and trade dress claims, and declined to read such a distinction into the statute. *Id.* at ——, 112 S.Ct. at 2760–61. The Court reviewed the legislative history of section 43(a) and concluded:

> Engrafting onto [§] 43(a) a requirement of secondary meaning for inherently distinctive trade dress also would undermine the purposes of the Lanham Act. Protection of trade dress, no less than of trademarks, serves the Act's purpose to 'secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers[, as well as to] ... foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.'

*Id.* at ——, 112 S.Ct. at 2760 (quoting *Park' N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 198, 105 S.Ct. 658, 663–64, 83 L.Ed.2d 582 (citing S.Rep. No. 1333, 79th Cong., 2d Sess., 3–5 (1946) (citations omitted))). The Court held that proof of secondary meaning need not be shown where the trade dress is found to be inher-

ently distinctive. *Two Pesos,* —— U.S. ——, —————, 112 S.Ct. 2753, 2759–61.

For a trade dress to be inherently distinctive, a court must examine the trade dress and consider factors such as:

> whether it [is] a 'common' basic shape or design, whether it [is] unique or unusual in a particular field, [and] whether it [is] a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods....

*Brooks Shoe Mfg. Co. v. Suave Shoe Corp.,* 716 F.2d 854, 858 (11th Cir.1983) (alteration in original) (footnotes omitted) (quoting *Seabrook Foods, Inc. v. Bar–Well Foods, Ltd.,* 568 F.2d 1342, 1344 (Cust. & Pat.App.1977)); *see also AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1536 (11th Cir. 1986). Where the dress includes arbitrary features that neither assist in describing the product nor assist in its effective packaging, the dress is inherently distinctive. *Ambrit,* 812 F.2d at 1536. "The existence of descriptive elements does not eliminate the possibility of inherent distinctiveness in the trade dress as a whole." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.,* 932 F.2d 1113, 1120 (5th Cir.1991), *aff'd,* —— U.S. ——, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

Defendants first contend that the use of colors as part of the package's background is merely ornamental and is not perceived as an indication of source. Defendants further assert that the use of "rainbow" patterns on packaging and products is common, as are the use of animal graphics, peace signs, and musical notes, to name a few.[4] While, generally, individual

---

**3.** Marks are generally classified as either (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *Id.* at ——, 112 S.Ct. at 2656–57. The latter three categories of marks are deemed inherently distinctive because their intrinsic nature serves to identify a particular source of a product. Marks falling in one of these three categories are entitled to protection, without a showing of secondary meaning. By contrast, generic marks—referring to "the genus of which the particular product is a species"— are not entitled to trademark protection. *Id.* (quoting *Park' N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83

L.Ed.2d 582 (1985). And finally, descriptive marks—those used to describe a product—may be afforded protection where secondary meaning has been acquired. *Two Pesos,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757.

**4.** Defendants submit numerous affidavits by members of the novelty stationery industry. These persons declare that the use of rainbow colors, color graduation, bright and bold colors, and designs of animals and other shapes are not unique to the industry. *See* Declaration of Beran ("Beran Decl."), Defendants' Ex. B; Fine Decl., Defendants' Ex. J; Goldberg Decl., Defen-

colors are not afforded trade dress protection, the use of colors to create a unique overall impression may go beyond "mere ornamentation" and can be an indicator of source. Additionally, it is not solely the use of certain designs or patterns that creates an inherently distinctive dress. Rather, it is the particular combination of these elements that gives rise to distinctiveness. Here, in reviewing the trade dress at issue, the LFI products do contain a common thread that is likely to be found inherently distinctive.

Moreover, Defendants assert that extensive use by third parties of elements similar or identical to a dress renders that dress inherently non-distinctive. Defendants direct the Court's attention to products sold by competitors in the field of novelty stationary items. While there are isolated similarities among the various products, they do not present an overall image consistent with the LFI look. "Isolated or piecemeal third party uses of various elements of the [LFI] trade dress do not detract from the distinctiveness of the overall impression conveyed by the combination of those elements" in the LFI products. *AmBrit*, 812 F.2d at 1537.

In this instance, Plaintiffs are likely to prove that the LFI trade dress is inherently distinctive. LFI's use of bold colors and a graduated color-fade with knock-out graphics and other artwork on the package does not serve to assist in describing the product or the product's use. This unique use of colors and graphics creates a distinctive visual impression in the minds of consumers. This finding is consistent with decisions from courts faced with the question of inherent distinctiveness. *See e.g. AmBrit*, 812 F.2d at 1536–37 (klondike bar dress "with its square size, bright coloring, pebbled texture, polar bear and sunburst images, and distinctive style of printing" is inherently distinctive); *Taco Cabana*, 932 F.2d at 1120–1121 (affirmed jury finding that trade dress of mexican restaurant was inherently distinctive); *Chevron Chemical Co. v. Voluntary Purchasing Groups Inc.*,

659 F.2d 695 (5th Cir.1981), *cert. denied*, 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982) ("particular hues of [ ] colors, arranged in certain geometric designs, presented in conjunction with a particular style of printing," taken together, create distinctive visual impression); *cf. Brooks Shoe Mfg.*, 716 F.2d at 858 ("V" on side of running shoe not inherently distinctive).

Accordingly, Plaintiffs' are likely to prove at trial that the LFI trade dress is inherently distinctive. While the issue of secondary meaning need not be addressed, the Court also finds that Plaintiffs are likely to establish secondary meaning at trial.

#### b. Secondary Meaning

"A product's trade dress attains secondary meaning when the purchasing public associates the dress with a single producer or source rather than just the product itself." *First Brands*, 809 F.2d at 1383 (citing *Inwood Labs.*, 456 U.S. at 851 n. 11, 102 S.Ct. at 2187 n. 11; *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 78 (9th Cir.1985)); *see also Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1359 (9th Cir.1985) (en banc). In the Ninth Circuit, proof of intentional copying "strongly supports" an inference of secondary meaning. *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir.1989); *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *Fuddruckers*, 826 F.2d at 844 (court upheld jury instruction permitting, but not requiring, an inference of secondary meaning from finding of intentional copying).

In addition, other factors to be taken into account include: (1) whether actual purchasers associate LFI's trade dress with LFI; (2) the degree and manner of LFI's use of the trade dress; and (3) whether LFI's use of the trade dress has been exclusive. *Vision Sports*, 888 F.2d at 615; *see also Transgo*, 768 F.2d at 1015. "An

dants' Ex. K; Kraus Decl., Defendants' Ex. P. The Court recognizes that, on an individual basis, these elements may not be afforded protec-

tion. However, the unique combination of these elements can serve as a indicator of source.

expert survey of purchasers can provide the most persuasive evidence of secondary meaning." *Vision Sports*, 888 F.2d at 615 (citing *Levi Strauss*, 778 F.2d at 1358).

### 1. *Evidence of Intentional Copying*

Plaintiffs bring forth the following evidence of intentional copying:

Debra M. Kahn, the owner and founder of a company known as "Party Fun in Games," filed a declaration in this action and testified at hearing. Ms. Kahn testified under oath that while attending a stationery and novelty products trade show in New York City, New York, on May 19–23, 1990, she was approached by Defendant Litvack. Litvack introduced himself as the President of Impact International, and requested to see her product line. Kahn asserts that Litvack commented that the packaging she used was identical to LFI's. In comparing Kahn's products to LFI's, Litvack specifically referred to the packaging, which used a polybag and cardboard header card, and to the airbrush artwork on the calendar mock-up.

Kahn further testified that Litvack commented that she was "another Lisa Frank" and asked whether she would be interested in creating products for Impact. Litvack and Kahn met on a number of occasions to discuss the possibility of working together. During these discussions, Litvack informed her that he was interested in developing products that look "like Lisa Frank," and that he hoped to replace Lisa Frank products with his own. According to Kahn, Litvack also expressed interest in creating a Halloween product line.

Kahn contends that Litvack sent her a copy of LFI's catalog for her review. In reference to the catalog, Litvack stressed that he was interested in developing products using similar packaging to LFI's. Kahn agreed to design products for Impact, and a confidentiality agreement was signed. On a number of occasions subsequent to the agreement, Litvack discussed his desire to design products that looked like LFI's and to use vinyl pouches as the packaging for his activity packs—the packaging used by LFI for its activity packs.

In June of 1990, Kahn and Litvack had a series of meetings in Southern California. At this time, Kahn contends that Litvack again expressed his intent to develop Halloween party favors, specifically making reference to possessing "inside information" of LFI's new, not-yet-distributed line of Halloween favors. Litvack further commented that Kahn should look to the LFI party favor products for reference in developing similar products for Impact.

Kahn further testified that during many telephone conversations between July of 1990 to January of 1991, Litvack repeatedly stressed that he wanted the packaging to come "as close to Lisa as possible." Litvack also stated that he had copied LFI's Color Your Own Stickers and intended to use the same color pens for the product as selected by LFI. At hearing, Kahn produced an audio tape documenting Litvack's admission that he copied LFI products.[5]

In response to Ms. Kahn's testimony, Litvack asserts that Kahn has perjured

---

5. The tape memorialized the following discussion:
   Kahn: Hey, did you figure out how you wanted to package those or did you get that far with it or no? Remember you were discussing vinyl pouches.
   Litvack: Right now we'll start the vinyl pouches.
   Kahn: Oh, right now. Okay.
   Litvack: We haven't gotten all the final costs of all the components yet, but right now we'll start with the vinyl pouches, and we'll price it both ways and if there's a squeeze we can always use poly bags, *but I want to come as close to Lisa as possible so I think we'll stick with they vinyl pouches.*

Excerpt from October, 1990 Conversation (emphasis added).
   Litvack: ... *Lisa Frank had a good idea which we copied.* (Laugh.)
   Kahn: What, the stickers?
   Litvack: The color your own stickers.
   Kahn: Yeah, you told me about that.
   Litvack: But we did them with licenses, when we copied them.... And the factory came back and says what color markers should we use and I said the same ones she's using.... Yeah, of course, it's more fun that way.... It's not fun the other way....
Excerpt from January 29, 1991 Conversation (emphasis added).

herself under oath because the two had been involved in a sexual relationship and that Kahn had been "disappointed" with its outcome. It is Litvack's contention that Kahn's declaration is nothing more than an attempt to "even the score." Declaration of Kenneth Litvack ("Litvack Decl."), at 6. Kahn denies that any such relationship existed. The issue of Kahn's sexual history with Litvack—or lack thereof—has no relevance to the present action. Defendants' "scorned woman" defense is an inherently sexist attack on Kahn's credibility that has little legal basis. It is insufficient to rebut the overwhelming evidence of intent to copy on the part of Litvack.

The record contains further evidence of Defendants' intent to copy. Rhonda Rowlette, Corporate Secretary for LFI, declares under oath that Barry Silberman, while an LFI executive, received foil samples from 21st Century Fishing, an LFI vendor. On or about January 2, 1991, 21st Century verified that they had sent Barry Silberman a package of foil samples, at his request. Rowlette Decl. ¶ 6. Silberman's position at LFI, however, did not relate to pre-production. *Id.* Barry Silberman resigned from LFI on January 16, 1991 and became the President of Style Club shortly thereafter. Moreover, David Fuss, President of F.O.B. distributors, a Canadian distributor, declares under oath that he visited Barry Silberman at Style Club in November of 1991. While at Style Club, Fuss declares that he observed many LFI products throughout Silberman's office.[6]

And finally, the evidence reveals that Cleta Magyar, an LFI employee from March 1, 1990 until June 28, 1990, made at least eighteen unauthorized telephone calls to Impact in New Jersey from an LFI telephone in Tucson, Arizona. *See* Rowlette Decl. & Ex. 1–2; Magyar Depo. Magyar admitted to placing the calls, claiming that they were personal in nature. Rowlette Decl. ¶ 3. In August of 1990, Magyar worked as a consultant for Impact, Litvack Dep. at 151–52, and in November, 1990, Magyar began working for Litvack as an operations manager. *See* Magyar Depo. A reasonable jury could draw a negative inference from these calls.

In opposition to the above evidence, Defendants have submitted numerous affidavits from artists who have worked for Impact, either as an employee or a consultant.[7] In these affidavits, the artists declare that all works were independently created. They further assert that at no time did they refer to or copy any LFI product or design. Affidavits from employees and others who seek financial gain were this motion denied, however, contain an inherent bias. Defendants further submit affidavits from former employees of LFI. These declarants state that LFI obtained competitors' catalogs on a regular basis under the fictitious name "Peggy Penguin." *See* Cooley Decl., Defendants' Ex. G. Although this evidence is not disputed, LFI's receipt of competitor's catalogs is not at issue here.[8]

6. Further evidence of Defendants' bad faith is found in the affidavit submitted by David Fuss. Fuss declares under oath that he is President of a Canadian distributor known as F.O.B. Distributors. Fuss contends that in late 1990, he contacted Barry Silberman, then Vice President of Sales at LFI, to discuss Canadian distribution of LFI products. In December of 1990, correspondence by Fuss and Silberman lead to Silberman's interest in F.O.B.'s services. However, on January 11, 1991, Fuss was informed that LFI was no longer interested in a Canadian distributor.

On January 16, 1991—five days later—Silberman left LFI and subsequently began working for Impact. In the interim, Fuss arranged to become LFI's canadian distributor with Howard Morrison, Barry Silberman's successor at LFI. Morrison indicated that it had always been

LFI's intention to have a Canadian market. A few months later, Silberman telephoned Fuss to inquire as to whether F.O.B. Distributors would act as distributor for Impact.

7. *See* Bussison Decl., Defendants' Ex. C; Cherry Decl., Defendants' Ex. E; Cimetta Decl., Defendants' Ex. F; Derosa Decl., Defendants' Ex. H; Mininni Decl., Defendants' Ex. S; L. Silberman Decl., Defendants' Ex. V; Sirott–Cope Decl., Defendants' Ex. W.

8. Mary Ann Cooley, former personal assistant to Lisa Frank, states that she was required to perform personal duties for Lisa Frank which were "distasteful," and that Lisa Frank treated her like a "personal servant" and was "abusive." These statements, beyond doubt, are irrelevant to the issues raised in this lawsuit. The Court

Accordingly, Plaintiffs have brought forward substantial evidence of Defendants' intent to copy the LFI trade dress. Proof of actual intent "strongly supports" a finding of secondary meaning.

### 2. *Remaining Factors*

#### a. Actual Purchasers Association of Trade Dress With LFI

Plaintiffs assert that consumers in the relevant market have come to associate the LFI trade dress with Lisa Frank. In support of this contention, Plaintiffs submit a Declaration from Nelvia McGrath, an experienced buyer for a large chain of drug stores.[9] McGrath contends that the LFI products, packaging and designs have a unique and distinctive visual appearance which, prior to the advent of Style Club, was found in no other product of its kind. McGrath Decl. ¶ 6. Moreover, McGrath contends that, based on her experience, LFI is the most recognized brand by customers of Eckerd, both by the "Lisa Frank" logo and by the distinctive visual appearance. McGrath Decl. ¶ 7.

In addition, the evidence reveals that LFI receives more than 300 letters a week from young fans praising the unique look of the LFI products. In one letter, an eighth grade girl states, "[W]hen I look for school supplies I notice your products right away. They are bright, bold, and beautiful." Frank Decl., Ex. 3. A letter written by an eleven-year-old girl states, "I like your

stickers alot [sic] ... [a]nd I got alot [sic] of Lisa Franks...." *Id.*[10] These letters are exemplary of the strong association consumers have with LFI products.

#### b. Degree and Manner of LFI's Use

■■■■■ Evidence of sales, advertising and promotional activities are relevant to a determination of whether a particular trade dress has acquired secondary meaning. *First Brands*, 809 F.2d at 1383. Advertising and promotional activities, however, must contain "image advertising"—that is, the ads should display the trade dress itself. *Id.* (citing *Brooks*, 716 F.2d at 860). "Otherwise, even evidence of extensive advertising or other promotional efforts would not necessarily indicate that prospective buyers would associate the trade dress with a particular source." *Id.* Moreover, large sums of money spent on advertising do not in themselves create legally protectable rights; rather, the test for secondary meaning is the effectiveness of those expenditures. *Id.* at 1383.

During the past five years, LFI's sales have increased 1,629%, exceeding $20 million in 1991. Frank Decl. ¶ 8. In 1991, LFI spent in excess of $500,000 for advertising and promotion, and LFI forecasts expenditures exceeding $1,000,000 for 1992. Green Decl. ¶ 6. Furthermore, LFI products have a "sell-through" rate above 95%.[11] Frank Decl. ¶ 7; McGrath Decl. ¶ 4. LFI's advertising includes print advertise-

---

cannot find any legitimate purpose for the submission of such evidence—except to inject bias into the court's decision-making process. The Declaration of Mary Ann Cooley, to the extent that it serves as a personal attack on Lisa Frank, shall be disregarded.

**9.** McGrath states that while she was the senior buyer of high fashion stationery and related novelty products for Eckerd Drugs from approximately 1986 to May, 1992, she developed extensive experience with LFI products. McGrath Decl. ¶ 6.

**10.** Plaintiffs have brought forward survey evidence on the issue of secondary meaning. The results of this study indicate that the LFI product line is clearly recognizable and identified by its distinctive overall visual appearance. Perez Decl. ¶ 5. In particular, the study reveals that 80% of the sample associated the products with LFI.

This study was conducted in two geographical areas—Los Angeles, California and Long Island, New York. Participants of the Long Island, New York study were chosen from the Lisa Frank fan club and LFI catalog lists. These participants would already be familiar with LFI products, and hence, are not necessarily representative of an average consumer. Because the study was not conducted from a universe of "potential" customers, that portion of the study relating to the Long Island survey is entitled to little, if any, weight. Notwithstanding the survey's methodological deficiency, Plaintiffs have brought forth sufficient evidence to establish that they are likely to prove secondary meaning at trial. *See e.g., Faberge, Inc. v. Saxony Products, Inc.*, 605 F.2d 426, 428 (9th Cir.1979) (inconclusive survey not determinative).

**11.** The "sell-through" rate is the percentage of products sold at a non-discounted price.

ments in consumer and trade publications, direct mailings, in-store signs, displays and other point-of-purchase materials, and product inserts. Green Decl. ¶ 6. Many of the advertisements prominently display LFI products and clearly depict its trade dress.

Moreover, LFI engages in extensive promotional activities, including the sponsorship of national and local children's events, promotion of store openings, operation of a national fan club, participation in joint promotions with other nationally recognized product companies, and attendance at industry trade shows. *See* Green Decl., Ex. 3–4, 6. LFI products are also advertised in advertisements produced by stores such as Target, Toys 'R Us, and Phar–Mor. *See* Green Decl., Ex. 5. Additionally, Lisa Frank and the LFI products have been the subject of unsolicited media attention. Evidence of extensive unsolicited media coverage supports a finding of secondary meaning. *See Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 644 F.2d 946, 950 (2d Cir.1981).

Defendants argue that Plaintiffs should be precluded from bringing forth evidence of sales, advertising, and promotional figures because LFI refused to respond to Defendants' discovery requests for this information. Prior to this motion, Plaintiffs submitted financial statements to the Court for *in camera* review, and therefore, this evidence shall not be precluded. Moreover, Defendants contend that the sales and advertising figures submitted by Plaintiffs are unsubstantiated and do not differentiate with respect to individual products. This contention goes to the weight and not the admissibility of such evidence. In any light, Defendants had an opportunity to cross-examine Mr. Green on this issue at the hearing, but did not do so for apparently tactical reasons. The Court finds that the figures submitted by LFI are probative evidence of secondary meaning.

#### c. Exclusiveness of LFI's Use

LFI was the first and only company— prior to Impact's inception—to offer full lines of seasonal stationery and novelty products for young girls. McGrath Decl.

¶ 6; Frank Decl. ¶ 10. Merely by viewing the products in the market today (that have been presented to this Court), it is apparent that the LFI trade dress is unique in the market of novelty stationery items.

Accordingly, it is likely that Plaintiffs can establish at trial that LFI's unique use of bright colors in a graduated sequence, in addition to the use of bold graphics, are perceived as an indication of source by consumers. Again, the Court stresses that it is not any individual aspect of the designs that make up the LFI trade dress; but rather, a potentially protectable trade dress may be recognized in the unique combination of those elements.

#### 3. *Likelihood of Confusion*

Regardless of whether a trade dress is non-functional and is inherently distinctive (or has acquired secondary meaning), there is no infringement if Plaintiffs cannot prove a likelihood of confusion among consumers. This element is satisfied where the confusion results "from the total effect of the defendant's product and package on the eye and mind of an ordinary purchaser." *First Brands,* 809 F.2d at 1384 (citing 1 J. McCarthy, Trademarks and Unfair Competition, § 8:3). Factors considered in the likelihood of confusion context include: 1) evidence of actual confusion; 2) defendant's intent in adopting the dress; 3) similarity of trade dress; 4) similarity of goods; 5) similarity of marketing channels; 5) strength of the trade dress; and 6) the type of goods and likely degree of purchaser care or sophistication. *Fuddruckers,* 826 F.2d at 845 (citations omitted); *Vision Sports,* 888 F.2d at 616. These factors need not be given even weight. *Id.*

Based on the analysis below, the Court finds that Plaintiffs have brought forth sufficient evidence of likelihood of confusion with respect to the trade dress at issue. However, because Plaintiffs have not brought forth sufficient evidence regarding confusion of Defendants "Universal Studios Monster" line, except for the "Universal Studios Monsters" Pencils, the

Court has excluded these products from consideration.

### a. Survey Evidence

Survey evidence can provide probative evidence of likelihood of confusion in the marketplace. "In evaluating survey evidence, technical deficiencies go to the weight to be accorded them, rather than to their admissibility." *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir.1980); *Nestle Co., Inc. v. Chester's Market, Inc.*, 571 F.Supp. 763, 774 (D.Conn.1983).

Plaintiffs have produced a consumer survey study, presented by video. This survey was conducted by placing three products on a peg board, and asking participants to select which products were from the same source as those contained in a "friend's" collection (the LFI products). The results of this study indicate that children will confuse Style Club products with LFI products at least 40% of the time. *See* Perez Decl. ¶ 5 & Ex. 5, at 4 (report of findings).[12]

Only 32 young girls, between the ages of seven and twelve, participated in the study. Due to the small sample size, the survey results cannot be accorded great weight. However, the Court recognizes that Plaintiffs need not prove their entire case with certainty in order to obtain a preliminary injunction. After a careful review of the videotape, it became clear from the participant's comments that many believed that the Impact products were produced by LFI. Taking into account the survey's deficiencies, the Court nevertheless finds that the results of this survey provide some proba-

tive evidence of likelihood of confusion. *See e.g., SquirtCo*, 628 F.2d at 1091 (confusion by 25% of sample) (citing *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266 (7th Cir.1976) (15%)).

To rebut Plaintiffs' survey evidence, Defendants submit the Welter Pilot Study. Ex. Z, Welter Decl. In this study, Welter concludes that consumers were not likely to be confused between the LFI and Impact products at issue here. *See* Welter Decl. ¶ 13, Defendants' Ex. Z. The Welter Study was based upon the use of a display typical of that found in retail stores. This display, however, only contained a small portion of the products in question—LFI's Stamp Head Pens and Doods—and failed to include any of the Halloween products. Accordingly, the Welter study has little probative value as to the other products at issue. Moreover, the universe in this study was not exemplary of the relevant market—the universe included girls, boys and adults; the study was conducted only in Burnsville, Minnesota; and the sample size was relatively small (approximately 57 persons, only 14 of which were young girls). Because the universe was both too broad and too narrow, and because the study utilized only a limited number of the products at issue, the findings of the study have little probative value.

### b. Actual Confusion in the Marketplace

██ Plaintiffs describe two events evidencing confusion in the marketplace. First, the evidence reveals that an advertiser of a national chain of retail outlets confused the LFI products with that of Im-

---

12. The Court finds this survey to be reliable for the following reasons:
1. The survey was designed by experts in the field of conducting and designing surveys.
2. For the Los Angeles, California study, a market research firm selected the participants randomly by telephone.
3. The interviewers were given written instructions to insure consistency. These instructions provided interviewers with canned questions that were clear, precise, and presented in a non-leading manner.
4. Participants were selected from different geographical regions, and varied in age, ethnic and educational backgrounds.
5. Participants were shown products by LFI, Impact, and other third party manufacturers.

6. Answers were recorded verbatim by use of videotape, thereby insuring reliability.
However, the survey has some deficiencies, such as:
1. The survey was not conducted in a store setting.
2. For the Long Island, New York study, the universe of purchasers was selected from Lisa Frank Club members and catalog purchasers (however, confusion among those who are familiar with LFI products may be more probative of likelihood of confusion).
3. The sample of participants was limited to 32 girls.
Taken as a whole, these deficiencies do not outweigh the study's probative value.

pacts. In April, 1992, a Walgreens advertisement in the *Arizona Daily News* depicted the LFI "Easter Goodies" along side the Style Club "Easter Color Your Own Puzzles". Below the pictures of these products reads "Fun Easter Activities, Lisa Frank Easter goodies set or color puzzle choice. $1.99." Moreover, the Lisa Frank trademark is prominently displayed in the center of the advertisement. This advertisement was placed by Walgreens advertising personnel.

This advertisement does not demonstrate confusion in the marketplace by consumers because Walgreens advertisers are not "consumers" or "potential consumers" of LFI products, in terms of those who purchase the product at the retail level. The advertisement, however, is likely to cause confusion among consumers who view the advertisement. Moreover, the advertisement does demonstrate confusion among the marketers. The Court finds evidence of confusion among marketers to be probative evidence of likelihood of confusion. *See e.g., Sicilia Di R. Biebow & Co. v. Cox,* 732 F.2d 417, 433 n. 11 (5th Cir.1984) (evidence that grocers placed defendants's bottles into plaintiff's trays relevant to show actual confusion).

Defendants contend that this mix-up was merely a clerical error. In support, William A. Montgomery, an attorney in the law department of Walgreens, states that he contacted Mark Cordes of the Walgreen advertising department. Montgomery states that Cordes had no specific recollection of the circumstances involved· in the creation of the advertisement, but "believe[d] that the advertisement was simply a clerical error which was overlooked in the review process." *See* Montgomery Decl. ¶ 5–6, Defendants' Ex. T. This declaration is insufficient to rebut an inference of confusion. Defendants have not produced an affidavit from Mr. Cordes himself. Moreover, it is unclear from the Montgomery declaration that Mr. Cordes worked on the advertisement in question or had personal knowledge as to its creation. Defendants have failed to produce a declaration from any Walgreens advertiser with personal knowledge of the advertisement's incep-

tion. As such, the Court cannot conclude that the mistake in this advertisement was merely a "clerical error."

Defendants further contend that this evidence is irrelevant because the products displayed in the advertisements are not identical to those at issue here. Impact's "Easter Color Your Own Puzzle" is remarkably similar to the Impact "Color–In Easter Stickers," a product that Plaintiffs' do seek to enjoin. Confusion among similar products in the same product line provides probative evidence of likelihood of confusion. While this incident alone is insufficient to demonstrate a likelihood of confusion, it is but one piece of evidence that weighs in its favor.

In the second incident, Plaintiffs' counsel visited a Walgreens in Tucson, Arizona. When counsel requested that a store employee find the LFI products pictured in the advertisement, the sales clerk produced the Style Club product. Confusion by sales clerks is probative of likelihood of confusion. "Assuming the clerk was confused, this gives rise to an inference that purchasers would also be confused because salespersons are more likely than customers to be familiar with various marks on the merchandise they sell and hence are less likely to be confused." *Union Carbide Corp. v. Ever–Ready Inc.,* 531 F.2d 366, 384 (7th Cir.1976), *cert. denied,* 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976).

Accordingly, Plaintiffs have presented strong evidence of actual confusion in the marketplace.

### c. Defendant's Intent

Plaintiffs have presented substantial evidence of Defendants intent to copy both LFI products and packaging. *See* discussion of intent to copy, *supra.* Such evidence is "entitled to great weight because a defendant is presumed able to accomplish this purpose." *Fuddruckers,* 826 F.2d at 846 (quoting *Golden Door, Inc. v. Odisho,* 646 F.2d 347, 351 (9th Cir.1980) (citing *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 354 (9th Cir.1979))); *Harlequin Enterprises Ltd.,* 644 F.2d at 949. In assessing whether Plaintiffs' can prove likelihood of

confusion at trial, the Court places great weight on the evidence of Defendant Litvack's intentions.

### d. Similarity of Trade Dress

■ There is little doubt that the products at issue contain a vast number of similarities. The striking similarities found in the product line, packaging, colors and design cannot be explained away as mere coincidence. For exemplary purposes, the following is a sample of similarities contained in the Stamp Head Pens and Halloween Erasers:[13]

#### Stamp Head Pens

Product:
— Rainbow foil barrel.
— Blue inner cap.
— Pink outer cap.
— Lime green tip.
— Similar in size.

Graphics:
— Similar motifs, such as dolphins, hearts, the earth, and peace signs.

Background:
— Rainbow fade running the length of the package.
— White knock-out graphics.

Packaging:
— Similar graphics.
— Both state "self-inking."
— Identical form of packaging.
— LFI's package states "Collect them all!"
The Impact package states "Collect 'em all today!"

#### Halloween Erasers

Packaging:
— Use of blister card.
— Use of graduated fade.
— In right hand corner, LFI's package states "eerie erasers" in a lime green color. In right hand corner, Impact's package states "ghoulish erasers" in lime green color.

Product:
— Both LFI and Impact's eraser set contain a three-color version of a skull & crossbones; identical in size; pink eyes & nose.
— Both contain a pumpkin; same size and color.
— Both contain a "wacky witch" with a green face, pink mouth, and a blue wobbly hat leaning to the right.
— Both contain a black widow spider with eight arms going in the same direction; LFI's spider contains an hourglass on the back of the spider; Impact's spider has a circle on the back of the spider.

---

Moreover, the lettering contained on the back of the LFI packaging is consistently

**13.** Visual inspections by the Court are permissible as *an aid* in determining likely confusion. *Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc.,* 815 F.2d 500, 504 (8th Cir.1987) (emphasis added); *Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.,* 824 F.2d 665, 671 (8th Cir.1987).

However, this side-by-side comparison, standing alone, is insufficient to find a likelihood of confusion. Because a consumer, viewing Defendants' products must rely upon her memory of the Plaintiffs' dress, the passage of time may erase certain features. "[T]he court must be alert to realize that it is not its function to educate the purchasers, but rather to take their carelessness for granted, and to be ever-conscious of the fact that the simulation need not be identical; a confusing similarity in overall impression will justify the intervention of equity." 3A Callman § 20.08, at 33 (1991) (footnotes omitted).

written in purple ink. A review of products in this market reveals that Impact is the only other company to use the color purple, rather than black, on the back of its packaging.

Defendants assert that there are numerous individual differences between the products.[14] The Court agrees that by considering the individual features—separate and apart from the trade dress as a whole—numerous distinctions can be made.[15] The test for consumer confusion, however, is not whether the products can be differentiated when subjected to a side-by-side comparison, but rather, whether they create the same general overall impression. *See e.g., Harold F. Ritchie, Inc. v. Chesebrough–Pond's, Inc.,* 281 F.2d 755, 762 (2d Cir.1960); *cited in Direct Mktg. of Virginia, Inc. v. E. Mishan & Sons, Inc.,* 753 F.Supp. 100, 106 (S.D.N.Y. 1990). Additionally, in this case the likelihood of confusion is compounded where the similarities extend across several products in a product line. 3A Callman, Unfair Competition Trademarks and Monopolies § 20.34, at 277 (1988) (citing *Carol Cable Co. v. Grand Auto Inc.,* 4 U.S.P.Q.2d 1056, 1059 (N.D.Cal.1987)).

Defendants further contend that there is no likelihood of confusion because Impact's trade dress is consistent from product to product. Moreover, Defendants contend that the Halloween products always feature the "Tricky Treats" or "Universal Studios Monsters" logos. These consistencies, Defendants assert, militate strongly against any likelihood of confusion between Impact's and LFI's Halloween products. However, nowhere on the front of the Impact's packages is the name "Impact" or "Style Club." Defendants have not demonstrated that consumers associate the "Tricky Treats" or "Universal Studios Monsters" logos with Impact, rather than LFI.

And finally, Defendants assert that the black background found on the packaging of their pencil and pen products militates against any possible confusion. The Court finds that the graduated rainbow coloring and white knock-out graphics along the edge of Impact's packaging is similar to the LFI package design. Regardless of the black background, this combination of colors and graphics is predominant. A consumer, searching for the unique color combinations found on the LFI packaging, may likely choose the Impact product based on his or her belief that the product is simply a variation of the LFI product line. In addition, LFI does utilize the color black in some package designs, which may compound the risk of consumer confusion. *See* line of "Square Doods" products.

### e. Similarity of Goods and Marketing Channels

Clearly, the goods at issue are similar both in product—pencils, erasers, stickers, etc.—and packaging. In addition, both LFI and Style Club use similar marketing channels—mass merchandising national retail chains, such as Wal–Mart, K Mart, Toys 'R Us and Walgreens.

### f. Strength of the Trade Dress

Plaintiffs have brought forth evidence demonstrating that the LFI trade dress is strongly associated with LFI and its products. *See* discussion of secondary meaning, *supra.*

### g. Type of Goods and Sophistication of Buyers

In general, LFI and Impact products are marketed towards young girls ranging from 4–12 in age. These products are sold at a low cost and purchasers generally select these products from the shelves without great deliberation. As such, con-

---

**14.** Because a defendant normally does not slavishly copy the plaintiff's dress, but makes certain "colorable changes" which are "variations but not distinctions," the court should consider the points of general similarity rather than the less important points of specific difference. 3A Callman, Unfair Competition § 20.08, at 33 (1991).

**15.** "It has been well said that the most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." *Baker v. Master Printers Union of New Jersey,* 34 F.Supp. 808, 811 (D.C.N.J.1940); *quoted in* 3A Callman § 20.08, at 42 n. 31 (1991).

sumers are less likely to verify the source of the products.

Accordingly, the Court finds that Plaintiffs' are likely to establish a likelihood of confusion at trial. The combination of similar products and packaging, in addition to common marketing channels and the lack of sophistication amongst consumers of these products, favors a finding of likelihood of confusion. This likely confusion is further buttressed by Defendants' intent to copy the LFI packages and products.

## B. PROBABILITY OF SUCCESS ON THE MERITS OF COPYRIGHT CLAIM

Plaintiffs assert that they are likely to succeed on the merits of their claim for copyright infringement. In an action for copyright infringement, Plaintiff must prove: 1) Ownership of a valid copyright; and 2) copying of constituent elements of the work that are original. *See Feist Publications, Inc. v. Rural Telephone Service Co.,* — U.S. —, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

### 1. *Ownership of a Valid Copyright*

LFI maintains copyright registrations on the following products: Stamp Head; Stamp Head Pen; Color Your Own Easter Stickers; Color Your Own Stickers; Square Doods; Halloween Frightening Rings; Halloween Pencils; and Halloween Erasers. *See* First Amended Complaint ¶ 42. Under the Copyright Act, registrations constitute "prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c). "This presumption shifts the burden of proof to the challenging party to demonstrate why the item[s] in question [are] not copyrightable." *Transgo,* 768 F.2d at 1019 (citing H.R.Rep. No. 1476, 94th Cong., 2d Sess. 157 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5773).

### 2. *Copying*

■ "The test of infringement is whether the work is recognized by an ordinary observer as having been taken from the copyrighted source." *Transgo,* 768 F.2d at 1018 (quotation omitted). Infringement is established where there are sub-stantial similarities between the infringing work and the copyrighted work, and that the similarity was caused by the defendant's having copied the copyright holder's work. *Roth Greeting Cards v. United Card Co.,* 429 F.2d 1106, 1110 (9th Cir. 1970); *Transgo,* 768 F.2d at 1018. Infringement is not caused when the second work was independently created. *Feist Publications,* — U.S. at —, 111 S.Ct. at 1287.

■ Whether a work was copied is generally established indirectly through circumstantial evidence. Where a plaintiff demonstrates that he owns the copyright work in question, plaintiff must further demonstrate proof of access and substantial similarity. *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1162 (9th Cir.1977); *Roth Greeting Cards,* 429 F.2d at 1110; *McCulloch v. Albert E. Price, Inc.,* 823 F.2d 316, 318 (9th Cir.1987). Once the plaintiff has demonstrated both access and substantial similarity, the burden shifts to the defendant to prove that the work was not a copy, but was independently created. *Transgo,* 768 F.2d at 1018 (citing *Kamar Int'l, Inc. v. Russ Berrie & Co.,* 657 F.2d 1059, 1062 (9th Cir.1981)).

■ In this instance, Plaintiffs have presented strong evidence of actual copying. Besides Defendant Litvack's admissions, the number of similarities are so great that there remains little doubt that the LFI products were copied. Plaintiffs are also likely to prove copying through indirect evidence.

### a. Proof of Access

There is simply no question that Defendants had access to Plaintiffs' copyrighted works. Mr. Litvack himself maintained a licensing agreement with LFI prior to the development of the Impact product line. Litvack also hired a number of LFI employees, including Barry Silberman, Leslie Silberman, and Cleta Magyar. Moreover, the record reveals that Defendants received and reviewed LFI catalogs on a regular basis and that Barry Silberman maintained

a number of LFI products in his office. Proof of access is also supported by evidence of Litvack's intent to copy. *See supra.*

### b. Substantial Similarity

■ Plaintiff must establish that there is substantial similarity between the LFI and Impact works—not only of the general ideas of the works, but of the expression of those ideas as well. *McCulloch,* 823 F.2d at 318. The Ninth Circuit has set out a two-step test to determine substantial similarity. *McCulloch,* 823 F.2d at 319 (citing *Cooling Systems & Flexibles, Inc. v. Stuart Radiator, Inc.,* 777 F.2d 485, 492 n. 9 (9th Cir.1985)); *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985).

■ First, similarity of ideas may be shown by an extrinsic test which focuses on similarities in the objective details of the works. This extrinsic test may be decided as a matter of law. Second, similarity of expression depends on a subjective, intrinsic test which focuses on the response of the "ordinary reasonable person" to the works. "The issue is whether the 'ordinary reasonable person' would find the 'total concept and feel' of the works showed substantial similarity." *McCulloch,* 823 F.2d at 319 (citing *Litchfield,* 736 F.2d at 1357). The second step is best suited for determination by the trier of fact.

Under the extrinsic test, it is apparent that the LFI and Impact products contain similarities in the objective details of the works. Under the intrinsic test, the Court must determine whether a jury is likely to conclude that the "total concept and feel" of the works are substantially similar. The Court finds that, based on the evidence set out above, Plaintiffs are likely to prove that the "total concept and feel" of the Impact product line is substantially similar to LFI's.

■ Defendants raise the following arguments in their defense. Defendants first assert that any similarities are in the ideas only, and similarities in ideas alone do not rise to the level of copyright infringement. *Data East U.S.A., Inc. v. Epyx, Inc.,* 862 F.2d 204, 207 (9th Cir.1988). Defendants further contend that even if they have copied the expression, Plaintiffs cannot be afforded copyright protection because the ideas and expression of those ideas are indistinguishable. *See Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 742 (9th Cir.1971). Moreover, Defendants assert that the fewer the methods for expressing an idea, the more closely the allegedly infringing work must resemble the copyrighted work in order to establish substantial similarity. *Cooling Systems & Flexibles, Inc. v. Stuart Radiator, Inc.,* 777 F.2d 485, 491 (9th Cir.1985). And finally, Defendants contend that Plaintiffs' products are "useful articles" that are not afforded copyright protection. Under the Copyright Act, a useful article is "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101. Defendants assert that the components of the LFI products are utilitarian.

The Court rejects all of Defendants' arguments. First, Plaintiffs are likely to prove that Defendants copied substantially more than the ideas contained in the LFI products. In this instance, the "total concept and feel" of the Impact products are substantially similar to the LFI product line. *See Roth Greeting Cards,* 429 F.2d at 1110; *Pasillas v. McDonald's Corp.,* 927 F.2d 440, 443 (9th Cir.1991).[16] Second, the expression contained in the LFI works is not so indistinguishable from the ideas as to deny copyright protection. Third, the Court finds that there are a multitude of ways in which to express the ideas contained in the works at issue. Defendants are faced with an endless number of colors, designs, sizes and shapes from which to choose. As such, Defendants can effectively compete in the market without closely resembling LFI's works. And finally,

---

**16.** Defendants reliance on *Cooling Systems & Flexibles, Inc. v. Stuart Radiator, Inc., supra,* is inapposite. *Cooling Systems* involved the arrangement of a radiator catalog. The compilation of a factual work differs in many respects to the expression found in works of visual art.

the works in question do not have an intrinsic utilitarian function that serves to portray the appearance of the article or to convey information. Plaintiffs are not seeking to prevent Defendants from using any particular article. Rather, Plaintiffs seek to protect the unique combination of these elements that constitute the "expression" of the works in question.

### c. Proof by Defendants that Work was Independently Created

Assuming Plaintiff has demonstrated both access and substantial similarity, the burden shifts to Defendant to prove that the work was not a copy, but was independently created. Defendants bring forth a number of sworn affidavits from artists who have worked for Impact as either an employee or consultant. Each artist declares that Impact's products were independently created without reference to the LFI products. *See for example* Bussison Decl., Defendants' Ex. C; Cherry Decl., Defendants' Ex. E; Cimetta Decl., Defendants' Ex. F; Derosa Decl., Defendants' Ex. H.

At the hearing, Mr. Cimetta testified that the works in question were independently created. Cimetta, however, had no recollection of where the ideas arose because the products were created by "group" effort. Cimetta had little, if any, personal knowledge as to who ultimately made the decisions about product development. Cimetta, however, did make clear that the selection for the type of products, the packaging, and the colors came from Leslie Silberman, Director of Marketing at Style Club. Clearly, Ms. Silberman, a former employee of LFI, did have free access to LFI's creations.

Here the parties' works are so strikingly similar as to preclude the possibility of independent creation. Coupled with Defendants' access and evidence of Litvack's intent to copy, the Court finds that Plaintiffs are likely to establish copying at trial.

### C. EVIDENCE OF IRREPARABLE INJURY

■ In the trade dress and copyright contexts, a showing of likely success on the merits raises a presumption of irreparable harm to the plaintiff and a presumption that plaintiff has no adequate remedy at law. *Apple Computer*, 725 F.2d at 525 (copyright infringement); *STX, Inc. v. Trik Stik, Inc.*, 708 F.Supp. 1551, 1560 (N.D.Cal. 1988) (citing Gilson, Trademark Protection and Practice § 8.07[1]) (trade dress infringement); *see also Rodeo Collection*, 812 F.2d at 1220 (trademark).

■ Defendants argue that Plaintiff's delay in seeking a preliminary injunction demonstrates a lack of urgency and a lack of irreparable harm. Here, Plaintiffs filed their Complaint on December 11, 1991 and became aware of Defendants intention to distribute a Halloween line in April, 1992. Plaintiffs, however, did not move to amend their Complaint to allege infringement of the Halloween products until June 4, 1992, and waited until July 2, 1992 in which to file this Motion for Preliminary Injunction. Defendants assert that during this delay, Impact expended considerable sums of money in the sale, distribution, and advertising of its products, completed the manufacture, sale and shipment of the Easter items, and sold and delivered its back-to-school products. Accordingly, Defendants argue, Plaintiffs' delay negates the necessity for the extraordinary remedy they are seeking.

In support of their position, Defendants rely upon *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir.1985).[17] In *Citibank*, a national bank headquartered in New York filed a trademark infringement action against Citytrust, a Connecticut business that did business in New York. When Citytrust opened a branch in Long Island, Citibank sought to enjoin Citytrust from using its name in that particular market. *Id.* at 274. Citibank, however, did not file its motion for injunctive relief until ten weeks after it learned directly of Citytrust's plans, and more than nine months after it received notice through the press of Citytrust's intention to open the Long Is-

---

**17.** Defendants also cite to *Oakland Tribune, Inc. v. Chronicle Publ. Co.*, 762 F.2d 1374, 1377 (9th Cir.1985). *Oakland*, however, involved alleged violations of section 2 of the Sherman Act.

land office. *Id.* at 276. Affirming the district court's denial of the preliminary injunction, the Second Circuit concluded that a significant delay in applying for injunctive relief tended to neutralize any presumption that infringement alone would cause irreparable harm pending trial, and that such delay alone may justify a denial of a preliminary injunction. *Id.*

The Second Circuit further considered the following facts: Citytrust had advertised in the New York media as early as 1980; Citibank did not contest Citytrust's continued solicitation of business in New York; and that Citibank operated in Connecticut under the name "Citicorp"—thereby invading Citytrust's established territory and voluntarily placing its mark within close proximity of the Citytrust mark. *Id.* at 277.

Those additional facts considered by the *Citibank* court are not present in this case. Plaintiffs did not know of Defendants intent to produce and distribute the products at issue nine months prior to the filing of this motion; Plaintiffs are not conceding that Defendants should be allowed to continue marketing the products in certain markets, and; Plaintiffs have not voluntarily placed its trade dress within close proximity of Defendant's dress.

In this instance, Plaintiffs delay in filing this motion is excusable. Since the filing of this action, Defendants' have filed a Motion to Dismiss Kenneth Litvack for Lack of In Personam Jurisdiction; a Motion to Dismiss for failure to register copyrights; and a Motion to Transfer, pursuant to 28 U.S.C. § 1404(a). Ultimately, these motions were denied by the Court. Moreover, the parties have engaged in extensive discovery prior to the filing of this motion. From January, 1992 to present, Plaintiffs contend that they have received the following discovery requests: 1) approximately 358 requests for production of documents; 2) approximately 95 additional requests for production of documents; 3) approximately 46 interrogatories; 4) approximately 31 requests for admissions; 5) depositions of nine LFI and Stuart Hall employees in Arizona and Kansas City. *See* Hallam Decl.

¶ 2. Plaintiffs themselves have engaged in lengthy discovery. In addition, discovery disputes arose on numerous occasions that necessitated Court intervention. Factoring in the preparation time for this motion, it is apparent that any delay did not result from neglect. See *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 508 (9th Cir.1991) (no harm demonstrated where delay due to extensions requested by defendant).

In any light, Plaintiffs have brought forward evidence demonstrating that irreparable injury will result without an injunction. For example, in 1991 K Mart purchased more than $400,000 of LFI Halloween products. This year, K Mart did not purchase any LFI Halloween products, but instead bought Style Club products. Tringali Decl. ¶ 4. In addition, K Mart and Target purchased close to $1,000,000 less in back-to-school items by LFI, choosing instead to purchase the Style Club back-to-school products that are at issue here. Tringali Decl. ¶ 5. Plaintiffs further contend that irreparable harm is imminent because LFI's present licensees will decline to renew their licenses. Without an injunction, LFI's products can and will be copied, and as a result, will no longer warrant the license's higher price. Tringali Decl. ¶ 7.

## D. ALTERNATIVE TEST—BALANCE OF HARDSHIPS

Under the balance of hardships test, Plaintiffs must establish that serious questions are raised as to the merits of their claims and that the balance of hardships tips sharply in their favor. *Rodeo Collection*, 812 F.2d at 1217. Plaintiffs have raised serious questions as to the merits of their claims for trade dress and copyright infringement.

Moreover, in light of the above evidence, the Court finds that the hardships tips in Plaintiffs' favor. Plaintiffs have engaged in this line of business since 1979 and have invested substantial time and capital into the development and marketing of the LFI product line. On the other hand, Defendants have only recently developed its product line. Additionally, Plaintiffs seek

to enjoin only a limited number of products, and therefore, Defendants are not likely to be forced out of business by an injunction of only a portion of their product line. And finally, "[a]n openly avowed intention to compete unfairly will tip the scales in favor of the grant of preliminary relief." 3A Callman, Unfair Competition § 22.39, at 188 (1983) (footnotes omitted). Faced with clear evidence of Defendant Litvack's intent to deliberately steal from Plaintiffs, the Court finds that the hardship to Impact does not outweigh the harm that LFI will incur.

## V. SUMMARY OF FINDINGS

Plaintiffs have established that they are likely to succeed on the merits of their claims for trade dress and copyright infringement. Plaintiffs' trade dress is nonfunctional, is inherently distinctive, and Impact's products are likely to cause confusion among consumers. As to Plaintiffs' copyright claims, Plaintiffs are likely to prove both a valid copyright and copying on the part of Defendants. Moreover, Plaintiffs have proven that they will suffer irreparable injury without an issuance of the preliminary injunction and the balance of hardships tips decidedly in Plaintiffs' favor.

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion for Preliminary Injunction is GRANTED IN PART, consistent with the Preliminary Injunction set out below.

## VI. PRELIMINARY INJUNCTION

The Court having granted in part Plaintiffs' Motion for Preliminary Injunction, IT IS HEREBY ORDERED that:

A. Defendants Impact, Style Club, Kenneth Litvack, Barry Silberman, Leslie Silberman and Cleta Magyar, their employees, agents, attorneys, successors and assigns, and all those in active concert or participation with any of them, with actual notice hereof, are PRELIMINARILY ENJOINED and RESTRAINED, during the pendency of this action, from in any manner, directly or indirectly:

1. Imitating, copying, counterfeiting or making unauthorized use of Plaintiffs' trade dress and/or copyrights, as defined in Paragraphs B and C of this Order.

2. Manufacturing, producing, distributing, circulating, selling, offering for sale, moving, or otherwise disposing of, advertising, promoting or displaying any product bearing any simulation, reproduction, counterfeit, copy or colorable imitation of Plaintiffs' trade dress and/or copyrights, as defined in Paragraphs B and C of this Order.

3. Using any simulation, reproduction, counterfeit, copy, or colorable imitation of Plaintiffs' trade dress and/or copyrights, as described in Paragraphs B and C of this Order, in connection with the promotion, advertisement, display, sale, offering for sale, manufacture, production, circulation or distribution of Defendants' products.

4. Selling, distributing, offering for sale, advertising, promoting or displaying those products listed in Paragraphs D and E of this Order.

5. Assisting, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in subparagraphs 1–4 above.

6. Engaging in any other activity constituting an infringement of Plaintiffs' trade dress or copyrights, or of Plaintiffs' rights in its trade dress or copyrights, or to use or to exploit its trade dress or copyrights, as defined in Paragraphs B and C of this Order.

B. IT IS ORDERED that for the purpose of this preliminary injunction only and without intending that this be a final adjudication, Plaintiffs' trade dress is described as follows:

1. Designer stationery and novelty products displaying graphics and color combinations with a high degree of detail and crisp, precise and bold design colors, including the use of bold rainbow colors gradually fading into one another along the package or product, coupled with white knockout graphics or designs, applied to a blister card or polybag with header.

2. Novelty products with a Halloween motif, displaying graduated rainbow colors that gradually fade into one another along the package, made up of predominantly bold shades of purple, pink and blue, combined with the use of graphics, applied to either a blister card or polybag with header.

3. A separate dress is recognized in the Color Your Own Easter Stickers. The header card displays Easter graphics (such as tulips) with the use of bold colors, predominantly purple and pink. The product is made up of sheets of stickers depicting Easter characters, drawn in purple ink. The package includes four markers—purple, pink, yellow, and blue. The trade dress is additionally recognized by a boldly colored egg shaped sticker on the front of the package.

C. IT IS ORDERED that for the purpose of this preliminary injunction only and without intending that this be a final adjudication, Plaintiffs' copyrights are described as follows:

| Work | Class and Registration No. | Date of Reg. |
|---|---|---|
| Stamp Head Pens | VA479–516 | Dec. 6, 1991 |
| Color Your Own Easter Stickers | VA193–075 | Oct. 24, 1990 |
| Color Your Own Stickers | VAu176–690 | March 14, 1990 |
| Halloween Pencils | VA376–057 | Nov. 13, 1989 |
| Halloween Frightening Rings | VAu176–685 | March 14, 1990 |
| Halloween Erasers–1991 | VA501–977 | May 6, 1992 |

D. IT IS ORDERED that for the purpose of this preliminary injunction only and without intending that this be a final adjudication, the particular products and packaging sold by Defendants that contain the trade dress at issue, as set out in Paragraph B of this Order, are as follows: Stylin Stamper Pen, Romance Roller, Ring Stampers, Wheelies Roller Stamps, Charmerz, Grooverz, Wild Writers, Dazzlerz, Color–In Easter Stickerz, all products in the Tricky Treat product collection, and the Universal Studios Monster Pencils.

E. IT IS ORDERED that for the purpose of this preliminary injunction only and without intending that this be a final adjudication, the particular products sold by Defendants that are infringing upon the copyrights at issue, as set out in Paragraph C of this Order, are as follows: Stylin Stamper Pen, Color–In Easter Stickerz, Tricky Treats Eerie Erasers, Tricky Treats Creepy Rings, and Monster Pencils.

F. IT IS ORDERED that Defendants are PRELIMINARILY ENJOINED and RESTRAINED from disposing of any business records of any kind regarding the importation, purchase, sale or other disposition of any of the products referred to in Paragraphs D and E of this Order.

G. IT IS ORDERED that this PRELIMINARY INJUNCTION shall not be construed as preventing Defendants from using any particular element found in the LFI trade dress, such as the use of a graduated rainbow color fade, fluorescent colors, or knock-out graphics, provided that such packages and products are so differentiated in general appearance from Plaintiffs' trade dress, as defined in Paragraph B of this Order, that they are not calculated to deceive the ordinary purchaser.

H. IT IS ORDERED that within thirty days of this order, Defendants shall serve on LFI a list of the names and addresses of all persons or entities who have received from Defendants or from anyone acting in concert with them, by purchase or otherwise any of the Style Club Products, and such list shall identify the items received by each person or entity.

I. IT IS ORDERED that Defendants are directed to serve a copy of this PRELIMINARY INJUNCTION by certified

mail upon all those entities encompassed in Paragraph H of this Order. A copy of the receipts shall be furnished to the Court.

J. IT IS ORDERED that Defendants shall respect the spirit of this Order.

## VII. BOND

Federal Rule of Civil Procedure 65(c) requires a bond for payment of costs and damages of any party wrongfully enjoined. Defendants submit that the bond should not be in an amount less than $2,500,000.

The Court finds that a bond in the amount of $500,000 shall be posted by Plaintiffs.